## KAHUKU PLANTATION CO. v. COMMISSIONER OF INTERNAL REVENUE.

## McBRYDE SUGAR CO., Ltd., v. SAME.
### No. 9944.

Circuit Court of Appeals, Ninth Circuit.
Dec. 31, 1942.

R. A. Vitousek, C. Dudley Pratt, and Montgomery E. Winn, all of Honolulu, T. H., for petitioners.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Benjamin M. Brodsky, and Bernard Chertcoff, Sp. Assts. to Atty. Gen., for respondent.

Before WILBUR, DENMAN, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is a review of a decision and order of the Board of Tax Appeals, now Tax Court of the United States, in a consolidated proceeding in which is questioned the validity of deficiency determinations of the Commissioner of Internal Revenue for each of the above petitioners for the tax year 1938. The identical contention is presented as to each. They do not question the Commissioner's following statement of facts.

The production of a mature crop of sugar cane in the Hawaiian Islands requires three years. The cane is planted in the first year, fertilized and cultivated in the second year, and harvested in the third year. Thus, there are three distinct crops in process in each year.

Prior to 1936 the taxpayers kept their books of account and made their income tax returns on the so-called "crop basis," charging to each crop all of the expenses incurred in its production, both "direct" and "indirect" expenses, and applying the total of such expenses against the selling price in the year when the crop was sold. The difference between those amounts was the gain or loss on the crop which the taxpayers reported in their income tax returns. This method of accounting and reporting income was approved by the Commissioner, under provision for such accounting in the tax statutes, of which Section 41 of the Revenue Act of 1936, c. 690, 49 Stat. 1648, 26 U.S.C.A. Int.Rev. Code, § 41, is typical.[1]

---

[1] "§ 41. General rule

"The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly

The direct expenses of each crop were the cost of plowing, preparing, cultivating, irrigating, fertilizing, etc., and the indirect expenses were such as camp sanitation, hospital maintenance, repairs, camp fuel, legal expenses, forestry maintenance, property taxes, workmen's compensations, insurance, industrial welfare, agricultural research, camp police, day nurseries, interpreters, and office salaries. Both types of expense were distributed or allocated to the three crops in process on the same basis, that is, on the basis of the actual labor hours required on each separate crop.

During 1935 the taxpayers entered into "Sugar-cane Production Adjustment Contracts" with the Secretary of Agriculture under authority of the Jones-Costigan Sugar Act, 7 U.S.C.A. § 608 et seq. By those contracts the taxpayers agreed to limit their sales of raw sugar for consumption during 1935 to certain fixed market quotas and to produce an additional amount of not less than 9% of their base production to be held in an "emergency reserve."

For 1935 Kahuku's total crop of sugar amounted to approximately 20,148 tons. Of that amount 18,414.76 tons were sold in 1935, and 1,733.435 tons were allocated to and held in the emergency reserve. McBryde's total crop for 1935 was approximately 23,016 tons, of which 21,622 tons were sold and 1,394.82 tons were retained in the emergency reserve. In closing their books for 1935 the taxpayers "inventoried" the sugar retained in the emergency reserve at the close of the year at cost of production, which was less than the market value at that time. The cost of production was arrived at by allocating to the reserve sugar a portion of the total cost of the entire 1935 crop, including both the direct and indirect expenses allocable thereto which had accumulated over the three-year production period. Kahuku's 1,733.435 tons of emergency reserve sugar were "inventoried" at $88,977.22, and McBryde's 1,394.82 tons at $65,378.93. Those amounts were taken up in the taxpayers' 1935 income returns, in which all of the expenses, both direct and indirect, which had been

charged against the entire 1935 crop, including the sugar sold as well as that held in the emergency reserve, were taken up as deductions.

Prior to December 31, 1935, all of the taxpayers' emergency reserve sugar had either been delivered, or was in transit, to the California & Hawaiian Sugar Refining Corporation, Ltd., at Crockett, Port of San Francisco, California, where it was to be held in bond to prevent its being processed or sold for consumption in the continental United States, under an arrangement with the Agricultural Adjustment Administration. The taxpayers had received partial payments on some of those shipments.

In their income tax returns for 1935 the taxpayers reported all of the proceeds from the sale of sugar in that year and also reported as "Other Income" the above amounts of sugar retained in the emergency reserve. Also, in their 1935 returns they claimed the deduction of all of the expenses, both direct and indirect, attributable to the entire 1935 crop.

A controversy arose between the taxpayers and the Commissioner as to the method of "inventorying" the emergency reserve sugar, the Commissioner contending that it should be "inventoried" at market value on December 31, 1935, instead of on the cost of production basis used by the taxpayers. The taxpayers' 1935 returns were finally audited without change in respect of that sugar.

On February 1, 1936, the petitioners applied to the Commissioner for permission to change their method of accounting to the extent of charging all of the indirect expenses such as property taxes, camp sanitation, hospital maintenance, etc., on the annual accrual basis in the year when such expenses were paid or incurred, rather than on the crop basis. On July 17, 1936, the Commissioner replied to this request in part as follows:

"Permission will be granted each of the taxpayers above named to change the method of allocating expenses to the respective crops under the crop basis of reporting income so as to take indirect charges on an annual basis as accrued in-

employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly

reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year."

stead of being allocated to the crops in process, provided the taxpayers express their willingness to exclude from deductions for the year of change and subsequent years the indirect charges which have been deferred under the method of allocating such costs to crops in process, and to confine the deductions for indirect charges for the year of change and subsequent years to those actually accruing within the given taxable year, excluding any deductions previously claimed in prior years. The taxpayers must, after making the change, report such deductions consistently with the method of accounting employed."

The petitioners agreed to the conditions set forth in the Commissioner's letter of July 17, 1936, and on August 28, 1936, permission for the petitioners to make the proposed change was granted by the Commissioner. That permission was worded in part as follows:

"Permission is hereby granted you to change your method of allocating expenses to the respective crops under the crop basis of reporting income, such change to be made in accordance with the conditions set forth in Bureau letter dated July 17, 1936 which are that indirect charges may be deducted on an annual basis as accrued instead of being allocated to the crops in process provided that the indirect charges which have been deferred under the method of allocating such costs to crops in process shall be excluded from deductions for the year of change and subsequent years, confining the deductions for indirect charges for the year of change and subsequent years to those actually accruing within the given taxable year, excluding any deductions previously claimed in prior years."

Under their modified accounting system, the taxpayers in December, 1936, wrote off, by a charge to surplus, all of the indirect expenses which had been allocated to the 1936 and 1937 crops in process prior to January 1, 1936. For Kahuku the total amount so written off was $175,616.49, of which $139,295.91 had been charged to the 1936 crop and $36,320.58 to the 1937 crop. The total amount written off by McBryde was $269,792.28, of which $188,-276.70 had been charged to the 1936 crop and $81,515.58 to the 1937 crop.

In further compliance with the conditions upon which permission for the ac-counting change was granted, the taxpayers in computing their profits on the 1936 crop deducted all of the direct expenses which had been charged to that crop in 1934, 1935 and 1936, and in addition, all of the indirect expenses paid or incurred during that year, a portion of which under the former method of accounting would have been allocated to the 1937 and 1938 crops.

In 1936 the taxpayers sold all of the sugar produced in that year as well as the emergency reserve sugar brought over from 1935, the quota restriction having been removed by the holding of the Agricultural Adjustment Act, 7 U.S.C.A. § 601 et seq., to be unconstitutional. See Rickert Rice Mills, Inc., v. Fontenot, 297 U.S. 110, 56 S.Ct. 374, 80 L.Ed. 513.

In their income tax returns for 1936 the taxpayers reported the profits on the 1936 crop, computed by deducting from the proceeds of the sales of sugar in that year the direct expenses incident thereto over the years 1934, 1935 and 1936, and all of the indirect expenses paid or incurred in that year in respect of the 1936, 1937 and 1938 crops. These computations, as applied to the 1936 crop, were in accordance with the accounting plan agreed to by the taxpayers and the Commissioner, and are not in question in this proceeding. In computing their profit on the sales of the emergency reserve sugar brought over from 1935 the taxpayers used as a cost basis the values at which this sugar had been "inventoried" at the close of 1935. The Commissioner has determined, however, that the "inventory values" which were based on cost of production, and included both the direct and indirect expenses allotted to the 1935 crop, were not the correct bases; that under the agreement by which the taxpayers were given permission to change their method of accounting the profits on the sale of the emergency reserve sugar carried over from 1935 must be computed in the same manner as the 1936 crop, i. e., by eliminating from the cost all of the deferred indirect expenses which had been allocated to it. This resulted in a reduction of $23,904.07 in the cost basis of the Kahuku's emergency reserve sugar, and of $17,090.49 in McBryde's, these being the respective amounts of such indirect expense. The Board (Tax Court) approved the Commissioner's determination.

The solution of the controversy depends upon the interpretation of the phrase "indirect charges *which have been deferred* under the method of allocating such costs to *crops in process,*" of the Commissioner's letter of August 28, 1936, in the provision for the change of accounting system sought by petitioners. That provision is " * * * indirect charges may be deducted on an annual basis as accrued instead of being allocated to the crops in process provided that the indirect charges which have been deferred under the method of allocating such costs to crops in process shall be excluded from deductions for the year of change and subsequent years, confining the deductions for indirect charges for the year of change and subsequent years to those actually accruing within the given year, excluding any deductions previously claimed in prior years."

A. Taxpayers contend that the Commissioner did not properly interpret and apply the proviso. They assert the phrase "crops in process" does not include the reserved portion of the sugar processed in 1935 and sold in 1936. They stress the words "crops in process," but ignore the past tense in the words "charges which have been deferred," under the abandoned method.

■ We are unable to agree with the taxpayers' contention. The proviso excepted future deductions of indirect cost charges which "have been deferred" in past years under the "method" then prevailing. The cost charges here sought as a deduction were made under the abandoned prior method of crop costing and are clearly excluded under the costing method of the agreement between the taxpayers and the Commissioner for the succeeding tax years. The Commissioner properly interpreted the agreement.

B. At the argument it was conceded that the reduction of $23,904.07 in the costs of Kahuku's emergency reserve sugar and of $17,909.49 in McBryde's resulted in a distortion of each of their net incomes.

This distortion arises from following the terms of the above proviso and disallowing a deduction of the amount of the deferred indirect overhead expenses of general management, taxes, etc. over all the properties of the taxpayers, from the proceeds of the 1936 sale of the sugar held over from the 1935 crop. It is not questioned that in 1936 and the two succeeding years the distortion will cause the taxpayers to pay different and, quite likely, more taxes than they would be liable for if the old accounting system had continued, or if the new system had prevailed in past years.

The taxpayers, although they have accepted and report their incomes under the agreement above set forth, contend that, as to an item which distorts the amount of tax paid, it shall not be deemed under the agreement, but shall receive some exceptional treatment by the Commissioner which will minimize or eliminate the distortion.

■■ We are of the opinion that a distortion as to a particular item of the 1936 income is a matter of which the taxpayers may not complain. It is practically impossible to shift from one complicated accounting system to another without some distortion and it is the duty of the Commissioner to provide in the agreement for the change in accounting that the distortion is not at a loss to the Government's income. The taxpayers sought the change in the accounting method and agreed to the proviso which excludes the cost items in question. Presumably there were business advantages to them in the change as a whole. They must take any particular disadvantage with the advantages.

The decision of the Tax Court is affirmed.

Affirmed.