# AMERICAN AUTOMOBILE ASSOCIATION $v$. UNITED STATES.

No. 288.   Argued April 17, 1961.—Decided June 19, 1961.

*Fleming Bomar* argued the cause for petitioner. With him on the brief was *Joseph E. McAndrews.*

*Assistant Attorney General Oberdorfer* argued the cause for the United States. With him on the briefs were former *Solicitor General Rankin, Solicitor General Cox* and *Harry Baum.*

MR. JUSTICE CLARK delivered the opinion of the Court.

In this suit for refund of federal income taxes the petitioner, American Automobile Association, seeks determination of its tax liability for the years 1952 and 1953. Returns filed for its taxable calendar years were prepared on the basis of the same accrual method of accounting as was used in keeping its books. The Association reported as gross income only that portion of the total prepaid annual membership dues, actually received or collected in the calendar year, which ratably corresponded with the number of membership months covered by those dues and occurring within the same taxable calendar year. The balance was reserved for ratable monthly accrual over the remaining membership period in the following calendar year as deferred or unearned income reflecting an estimated future service expense to members. The Commissioner contends that petitioner should have reported in its gross income for each year the entire amount of membership dues actually received in the taxable calendar year without regard to expected future service expense in the subsequent year. The sole point at issue, therefore, is in what year the prepaid dues are taxable as income.

In auditing the Association's returns for the years 1952 through 1954, the Commissioner, in the exercise of his discretion under § 41 of the Internal Revenue Code of 1939,[1]

---

[1] A taxpayer's "net income shall be computed . . . in accordance with the method of accounting regularly employed in keeping the

determined not to accept the taxpayer's accounting system. As a result, adjustments were made for those years principally by adding to gross income for each taxable year the amount of prepaid dues which the Association had received but not recognized as income, and subtracting from gross income amounts recognized in the year although actually received in the prior year. A net operating loss claimed for 1954 and corresponding carryback deductions were greatly reduced, and tax deficiencies were assessed for 1952 and 1953. Petitioner paid the deficiencies and its timely claim for refund was denied. Suit to recover was instituted in the Court of Claims, but the court sustained the Commissioner, —— Ct. Cl. ——, 181 F. Supp. 255. Recognizing a conflict between the decision below and that in *Bressner Radio, Inc.,* v. *Commissioner,* 267 F. 2d 520, we granted certiorari. 364 U. S. 813. We have concluded that for tax purposes the dues must be included as income in the calendar year of their actual receipt.

The Association is a national automobile club organized as a nonstock membership corporation with its principal office in Washington, D. C. It provides a variety of services [2] to the members of affiliated local automobile clubs and those of ten clubs which taxpayer itself directly

---

books . . . but . . . if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. . . ." 53 Stat. 24, 26 U. S. C. (1952 ed.) § 41. See also the similar provision in the Internal Revenue Code of 1954, 26 U. S. C. (1958 ed.) § 446.

[2] These generally include furnishing road maps, routing, tour books, etc.; emergency road service through contracts with local garages; bail bond protection; personal automobile accident insurance and theft protection; and, in some of its divisions, motor license procurement, brake and headlight adjustment service, notarial duties and advice in the prosecution of small claims.

operates as divisions, but such services are rendered solely upon a member's demand. Its income is derived primarily from dues paid one year in advance by members of the clubs. Memberships may commence or be renewed in any month of the year. For many years, the association has employed an accrual method of accounting and the calendar year as its taxable year. It is admitted that for its purposes the method used is in accord with generally accepted commercial accounting principles. The membership dues, as received, were deposited in the Association's bank accounts without restriction as to their use for any of its corporate purposes. However, for the Association's own accounting purposes, the dues were treated in its books as income received ratably[3] over the 12-month membership period. The portions thereof ratably attributable to membership months occurring beyond the year of receipt, *i. e.*, in a second calendar year, were reflected in the Association's books at the close of the first year as unearned or deferred income. Certain operating expenses were chargeable as prepaid membership cost and deducted ratably over the same periods of time as those over which dues were recognized as income.

The Court of Claims bottomed its opinion on *Automobile Club of Michigan* v. *Commissioner*, 353 U. S. 180 (1957), finding that "the method of treatment of prepaid automobile club membership dues employed [by

[3] In 1952 and 1953 dues collected in any month were accounted as income to the extent of one-twenty-fourth for that month (on the assumption that the mean date of receipt was the middle of the month), one-twelfth for each of the next eleven months, and again one-twenty-fourth in the anniversary month. In 1954, however, guided by its own statistical average experience, the Association changed its system so as to more simply reach almost the same result by charging to year of receipt, without regard to month of receipt, one-half of the entire dues payment and deferring the balance to the following year.

the Association here was,] . . . for Federal income tax purposes, 'purely artificial.' " 181 F. Supp. 255, 258. It accepted that case as "a rejection by the Supreme Court of the accounting method advanced by plaintiff in the case at bar." *Ibid.* The Association does not deny that its accounting system is substantially identical to that used by the petitioner in *Michigan.* It maintains, however, that *Michigan* does not control this case because of a difference in proof, *i. e.*, that in this case the record contains expert accounting testimony indicating that the system used was in accord with generally accepted accounting principles; that its proof of cost of member service was detailed; and that the correlation between that cost and the period of time over which the dues were credited as income was shown and justified by proof of experience. The holding of *Michigan,* however, that the system of accounting was "purely artificial" was based upon the finding that "substantially all services are performed only upon a member's demand and the taxpayer's performance was not related to fixed dates after the tax year." 353 U. S. 180, 189, note 20. That is also true here.[4] As the Association's own accounting expert testified:

"You are dealing with a group or pool. Any pooling or risk situation, particular members may in a particular year require very little of a specific service that is rendered to certain other members. I wouldn't know what the experience on that would be, but I would think it would be rather irregular between individual members. . . . I am buying the

---

[4] *Beacon Publishing Co.* v. *Commissioner,* 218 F. 2d 697, and *Schuessler* v. *Commissioner,* 230 F. 2d 722, may be distinguished from the present case on the same grounds which made them distinguishable in *Automobile Club of Michigan* v. *Commissioner,* 353 U. S. 180, 189, note 20.

> availability of services, the protection .... Frankly, the irregularity of the actual furnishing of the maps and helping you out when you run out of gasoline and so on, I frankly don't think that has a blessed thing to do with the over-all accounting."

It may be true that to the accountant the actual incidence of cost in serving an individual member in exchange for his individual dues is inconsequential, or, from the viewpoint of commercial accounting, unessential to determination and disclosure of the overall financial condition of the Association. That "irregularity," however, is highly relevant to the clarity of an accounting system which defers receipt, as earned income, of dues to a taxable period in which no, some, or all the services paid for by those dues may or may not be rendered. The Code exacts its revenue from the individual member's dues which, no one disputes, constitute income. When their receipt as earned income is recognized ratably over two calendar years, without regard to correspondingly fixed individual expense or performance justification, but consistently with overall experience, their accounting doubtless presents a rather accurate image of the total financial structure, but fails to respect the criteria of annual tax accounting and may be rejected by the Commissioner.

The Association further contends that the findings of the court below support its position. We think not. The Court of Claims' only finding as to the accounting system itself is as follows:

> "22. The method of accounting employed by plaintiff during the years in issue has been used regularly by plaintiff since 1931 and is in accord with generally accepted commercial accounting principles and practices and was, prior to the adverse determination by the Commissioner of the Internal Revenue, customarily and generally employed in the motor club field."

This is only to say that in performing the function of business accounting the method employed by the Association "is in accord with generally accepted commercial accounting principles and practices." It is not to hold that for income tax purposes it so clearly reflects income as to be binding on the Treasury.[5] Likewise, other findings merely reflecting statistical computations of average monthly cost per member on a group or pool basis are without determinate significance to our decision that the federal revenue cannot, without legislative consent and over objection of the Commissioner, be made to depend upon average experience in rendering performance and turning a profit. Indeed, such tabulations themselves demonstrate the inadequacy from an income tax standpoint of the *pro rata* method of allocating each year's membership dues in equal monthly installments not in fact related to the expenses incurred. Not only did individually incurred expenses actually vary from month to month, but even the average expense varied—recognition of income nonetheless remaining ratably constant. Although the findings below seem to indicate that it would produce substantially the same result as that of the system of ratable monthly recognition actually employed, we consider similarly unsatisfactory, from an income tax standpoint, allocation of monthly dues to gross monthly income to the extent of actual service expenditures for the same month computed on a group or pool basis. In addition, the Association's election in 1954 to change its monthly recognition formula [6] to one which treats one-half of the dues as income in the year of receipt

---

[5] The Hearing Commissioner of the Court of Claims had specifically found as fact that petitioner's "method of accounting . . . clearly reflected its net income for such years." The court, however, did not adopt that finding.

[6] See note 2, *supra*.

and the other half as income received in the subsequent year, without regard to month of payment, only more clearly indicates the artificiality of its method, at least so far as controlling tax purposes are concerned. Moreover, the Association realized that the findings of the Court of Claims were not alone sufficient for its purposes. In its petition for rehearing below, petitioner specifically asked that they be amended and enlarged, especially as to No. 22 set out above. Rehearing and amendment were denied.

Whether or not the Court's judgment in *Michigan* controls our disposition of this case, there are other considerations requiring our affirmance. They concern the action of the Congress with respect to its own positive and express statutory authorization of employment of such sound commercial accounting practices in reporting taxable income. In 1954 the Congress found dissatisfaction in the fact that "as a result of court decisions and rulings, there have developed many divergencies between the computation of income for tax purposes and income for business purposes as computed under generally accepted accounting principles. The areas of difference are confined almost entirely to questions of when certain types of revenue and expenses should be taken into account in arriving at net income." House Ways and Means Committee Report, H. R. Rep. No. 1337, 83d Cong., 2d Sess. 48. As a result, it introduced into the Internal Revenue Code of 1954 § 452 and § 462,[7] which specifically permitted essentially the same practice as was employed by the Association here.[8] Only one year later, however,

---

[7] 26 U. S. C. (1952 ed., Supp. II) §§ 452, 462, repealed, 69 Stat. 134 (1955).

[8] The Senate Report included this language:

"Under the 1939 Code, regardless of the method of accounting . . . amounts are includible in gross income by the recipient not later than

in June 1955, the Congress repealed these sections retroactively. It appears that in this action Congress first overruled the long administrative practice of the Commissioner and holdings of the courts in disallowing such deferral of income for tax purposes and then within a year reversed its own action. This repeal, we believe, confirms our view that the method used by the Association could be rejected by the Commissioner. While the claim is made that Congress did not "intend to disturb prior law as it affected permissible accrual accounting provisions for tax purposes," H. R. Rep. No. 293, 84th Cong., 1st Sess. 4–5, the cold fact is that it repealed the only law incontestably permitting the practice upon which the Association depends. To say that, as to taxpayers using such systems, Congress was merely declaring existing law when it adopted § 452 in 1954, and that it was merely restoring unaffected the same prior law when it repealed the new section in 1955 for good reason, is a contradiction in itself, "varnishing nonsense with the charm of sound." Instead of constituting a merely duplicative creation, the fact is that § 452 for the first time specifically declared petitioner's system of accounting to be acceptable for income tax purposes, and overruled the long-standing position of the Commissioner and courts to the contrary. And the repeal of the section the following year, upon insistence by the Treasury that the proposed endorsement of such tax accounting would have a disastrous impact on the Government's revenue, was just as clearly a mandate from the Congress that petitioner's system was not acceptable for tax purposes. To interpret its careful consideration of the problem otherwise is to

---

the time of receipt if they are subject to free and unrestricted use by the taxpayer even though the payments are for goods or services to be provided by the taxpayer at a future time." S. Rep. No. 1622, 83d Cong., 2d Sess. 301.

accuse the Congress of engaging in sciamachy. We are further confirmed in this view by consideration of the even more recent action of the Congress in 1958, subsequent to the decision in *Michigan, supra.* In that year § 455 [9] was added to the Internal Revenue Code of 1954. It permits publishers to defer receipt as income of prepaid subscriptions of newspapers, magazines and periodicals. An effort was made in the Senate to add a provision in § 455 which would extend its coverage to prepaid automobile club membership dues.[10] However, in conference the House Conferees refused to accept this amendment. Senator Byrd explained the rejection of the amendment to the Senate (104 Cong. Rec., Part 14, p. 17744):

> "It was the position of the House conferees that this matter of prepaid dues and fees received by non-profit service organizations was a part of the entire subject dealing with the treatment of prepaid income and that such subject should be left for study of this entire problem. . . ." [11]

It appears, therefore, that, pending its own further study, Congress has given publishers but denied auto-

---

[9] 26 U. S. C. (1958 ed.) § 455.

[10] An unsuccessful attempt to induce congressional action on this problem was made last year, see H. R. 11266, 86th Cong., 2d Sess., which passed the House August 24, 1960, 106 Cong. Rec. 17482, but failed to draw any action by the Senate before adjournment. An identical bill is currently pending, see H. R. 929, 87th Cong., 1st Sess., and H. R. Rep. No. 381 accompanying the bill and recommending its passage. Under that measure the taxpayer's liability to its members *"shall be deemed to exist ratably* over the period . . . that such services are required to be rendered, or . . . privileges . . . made available." (Emphasis added.)

[11] The Eighty-fourth Congress started the study of "legislation dealing with prepaid income and reserves for estimated expenses . . . ." S. Rep. No. 372, 84th Cong., 1st Sess. 6.

mobile clubs the very relief that the Association seeks in this Court.

To recapitulate, it appears that Congress has long been aware of the problem this case presents. In 1954 it enacted § 452 and § 462, but quickly repealed them. Since that time Congress has authorized the desired accounting only in the instance of prepaid subscription income, which, as was pointed out in *Michigan,* is ratably earned by performance on "publication dates after the tax year." 353 U. S. 180, 189, note 20. It has refused to enlarge § 455 to include prepaid membership dues. At the very least, this background indicates congressional recognition of the complications inherent in the problem and its seriousness to the general revenue. We must leave to the Congress the fashioning of a rule which, in any event, must have wide ramifications. The Committees of the Congress have standing committees expertly grounded in tax problems, with jurisdiction covering the whole field of taxation and facilities for studying considerations of policy as between the various taxpayers and the necessities of the general revenues. The validity of the long-established policy of the Court in deferring, where possible, to congressional procedures in the tax field is clearly indicated in this case.[12] Finding only that, in light of

---

[12] In 1955 it was estimated that transitional loss of revenue under § 452 and § 462, repealed that year, would total in excess of a billion dollars. H. R. Rep. No. 293, 84th Cong., 1st Sess. 3. That this impact on the revenue continues to be an important factor in congressional consideration of the problem is indicated by the observation of the House Committee on Ways and Means that a "transitional rule" is necessary "to minimize the initial revenue impact" of the measure currently pending. H. R. Rep. No. 381, 87th Cong., 1st Sess. 4. That the system used by petitioner here is, perhaps, presently not uncommon may be indicated by the fact that during this Term alone several cases involving similar systems have reached this Court.

existing provisions not specifically authorizing it, the exercise of the Commissioner's discretion in rejecting the Association's accounting system was not unsound, we need not anticipate what will be the product of further "study of this entire problem."                    *Affirmed.*

Mr. Justice Stewart, whom Mr. Justice Douglas, Mr. Justice Harlan and Mr. Justice Whittaker join, dissenting.

In *Automobile Club of Michigan* the Court pointed out that the method of accounting employed by the taxpayer was "purely artificial," so far as the record there showed. 353 U. S., at 189. Here, by contrast, the petitioner proved, and the Court of Claims found, that the method of accounting employed by the petitioner during the years in issue was in accord with generally accepted commercial accounting principles and practice, was customarily employed by similar taxpayers, and, in the opinion of qualified experts in the accounting field, clearly reflected the petitioner's net income. I do not understand that the Court today questions either that proof or those findings.[1]

The Court thus holds that the Commissioner is authorized to disregard and override a method of reporting income under which prepaid dues are deferred in direct

---

[1] The Court does not, for example, challenge Finding No. 26 of the Court of Claims:

"Had the plaintiff recognized, assigned and transferred to its gross income account its monthly receipts of dues collected in advance in the proportion to its cost of servicing all of its members each month, instead of ratably over the membership period of 12 months, the proportion of advance dues which would have been recognized and assigned to gross income during the years in issue herein would have been substantially the same as the gross income from dues as determined and reported by the plaintiff under the method of accounting actually employed."

relation to the taxpayer's costs under its membership contracts. The effect of the Court's decision is to allow the Commissioner to prevent an accrual basis taxpayer from making returns in accordance with the accepted and clearly valid accounting practice of excluding from gross income amounts received as advances until the right to such amounts is earned by rendition of the services for which the advances were made. To permit the Commissioner to do this, I think, is to ignore the clear statutory command that a taxpayer must be allowed to make his returns in accord with his regularly employed method of accounting, so long as that method clearly reflects his income.[2] The result, I am afraid, will be to engender far-reaching confusion and injustice in the administration of the Internal Revenue Laws.[3]

## I.

The Commissioner's basic argument against the deferred reporting of prepayments has traditionally been that such a method conflicts with a series of decisions of this Court

---

[2] Int. Rev. Code of 1939, § 41, 53 Stat. 24; Int. Rev. Code of 1954, § 446, 26 U. S. C. § 446.

[3] The scope of the problem is well illustrated by the reported cases. See, e. g., South Dade Farms v. Commissioner, 138 F. 2d 818 (rent received in advance); Clay Sewer Pipe Assn. v. Commissioner, 139 F. 2d 130 (subscriptions for promotion campaign to be consummated in years subsequent to receipt); Beacon Publishing Co. v. Commissioner, 218 F. 2d 697 (advance newspaper subscription payments); Bressner Radio, Inc., v. Commissioner, 267 F. 2d 520 (advance payments in a television servicing contract); Schlude v Commissioner, 283 F. 2d 234 (fees for dancing lessons paid in advance); Moritz v. Commissioner, 21 T. C. 622 ("customers' deposits" on undeveloped photographs); South Tacoma Motor Co. v. Commissioner, 3 T. C. 411 (proceeds from sale of coupons entitling bearer to garage services in later years); Your Health Club, Inc. v. Commissioner, 4 T. C. 385 (advance payments for use of gym and other facilities); Northern Illinois College of Optometry v. Commissioner, 2 CCH Tax Ct. Mem. 664 (tuition paid in advance).

which establish the so-called "claim of right doctrine." [4] In this case the Government abandoned that argument, with good reason. As four Circuits have correctly held, the claim of right doctrine furnishes no support for the Government's position. *Bressner Radio, Inc.,* v. *Commissioner,* 267 F. 2d 520, 524, 525–528 (C. A. 2d Cir.); *Schlude* v. *Commissioner,* 283 F. 2d 234 (C. A. 8th Cir.); *Schuessler* v. *Commissioner,* 230 F. 2d 722, 725 (C. A. 5th Cir.); *Beacon Publishing Co.* v. *Commissioner,* 218 F. 2d 697, 699–701 (C. A. 10th Cir.).[5] A claim of right without "restriction on use" may be the crucial factor in determining that particular funds are includable in gross income. See *North American Oil* v. *Burnet,* 286 U. S. 417; *United States* v. *Lewis,* 340 U. S. 590; *Healy* v. *Commissioner,* 345 U. S. 278. But it hardly follows that all such funds must necessarily be reported by an accrual basis taxpayer as income in the year of receipt, whether or not then earned.

---

[4] Almost all of the decisions sustaining the Commissioner's disallowance of deferred reporting of advances by accrual basis taxpayers have relied on the claim of right doctrine. See, *e. g., Andrews* v. *Commissioner,* 23 T. C. 1026, 1032–1033; *South Dade Farms* v. *Commissioner,* 138 F. 2d 818 (C. A. 5th Cir.) (but compare *Schuessler* v. *Commissioner,* 230 F. 2d 722 (C. A. 5th Cir.)); *Clay Sewer Pipe Assn.* v. *Commissioner,* 139 F. 2d 130 (C. A. 3d Cir.); *Automobile Club of Michigan* v. *Commissioner,* 230 F. 2d 585, 591 (C. A. 6th Cir.), aff'd on other grounds, 353 U. S. 180. The Tax Court has carried the claim of right doctrine to the point where it was found applicable to advance fees which were due but not yet paid. *Your Health Club, Inc.* v. *Commissioner,* 4 T. C. 385.

[5] The rejection of the applicability of the claim of right doctrine in these cases has been enthusiastically approved by legal commentators. See, *e. g.,* Gelfand, The "Claim of Right" Doctrine, 33 Taxes 726; Wolder, Deduction of Reserves for Future Expenses and Deferring of Prepaid Income, 34 Taxes 524; Note, 59 Col. L. Rev. 942, 946. But cf. Freeman, Tax Accrual Accounting for Contested Items, 56 Mich. L. Rev. 727, 730–732, 747.

The Government shifted its argument in this case to the contention that the "annual accounting requirement" demands that "[n]either income nor deduction items may be accelerated or postponed from one taxable year to another in order to reflect the long-term economic result of a particular transaction or group of transactions." The Government finds a basis for this argument in such cases as *Security Mills Co.* v. *Commissioner,* 321 U. S. 281; *Brown* v. *Helvering,* 291 U. S. 193; *Burnet* v. *Sanford & Brooks Co.,* 282 U. S. 359; *Guaranty Trust Co.* v. *Commissioner,* 303 U. S. 493; and *Heiner* v. *Mellon,* 304 U. S. 271.

The Court today does not base its decision on this theory, presumably because the Court believes, as I do, that the theory is not valid. Putting to one side the point that many of the cases relied on involved cash basis taxpayers,[6] these decisions no more pertain to deferred reporting of totally unearned receipts than do the claim of right decisions. These cases, like the claim of right cases, start from the premise that the income in question

---

[6] See, *e. g., Guaranty Trust Co.* v. *Commissioner,* 303 U. S. 493; *Burnet* v. *Sanford & Brooks Co.,* 282 U. S. 359. In the latter case, the Court took special notice of the fact that the taxpayer had not "attempted to avail itself" of the accrual sytem under which "expenses of a transaction incurred in one year might be offset by the amounts actually received from it in another." 282 U. S., at 366. In *Security Mills Co.* v. *Commissioner,* 321 U. S. 281, the taxpayer was attempting to use what the Court described as "a divided and inconsistent method of accounting not properly to be denominated either a cash or an accrual system." 321 U. S., at 287. In *Brown* v. *Helvering,* 291 U. S. 193, the taxpayer was on an accrual basis generally, but its assertion of a right to defer reporting "overriding commissions" constituted a change in accounting procedures as to the acceptance of which the Commissioner was said to have "wide discretion." 291 U. S., at 204. See the discussion in *Bressner Radio, Inc.,* v. *Commissioner,* 267 F. 2d 520, 525–526.

has been fully earned.[7]   The underlying premise of the annual accounting requirement is that *otherwise reportable income* derived from a transaction cannot be excluded from gross income in order to let the taxpayer wait to see in a later year how the over-all transaction turns out.[8] That is not the issue in this case.   The question here is whether any reportable income has been derived from a transaction when payments are received in advance of performance.

Although wisely rejecting the claim of right and annual accounting arguments, the Court decides this case upon grounds which seem to me equally invalid.   I can find nothing in *Automobile Club of Michigan* which controls disposition of this case.   And the legislative history upon which the Court alternatively relies seems to me upon examination to be singularly unconvincing.

In *Michigan* there was no offer of proof to show the rate at which the taxpayer fulfilled its obligations under its membership contracts.   The deferred reporting of prepaid dues was, therefore, rejected in that case simply because there was no showing of a correlation between the amounts deferred and the costs incurred by the taxpayer in carry-

---

[7] With the possible exception of contingent related expenditures, which cannot be accurately measured.   See *Brown* v. *Helvering,* 291 U. S. 193, 200–201.

[8] This becomes entirely clear upon examination of the cases upon which the Government relies.   For example, in *Heiner* v. *Mellon,* 304 U. S. 271, members of partnerships which had been formed to liquidate two corporations attempted to defer reporting income earned during the year until it could be determined in a subsequent year whether the partnerships' over-all liquidation enterprise had been profitable.   The Court held that such a postponement was barred by the annual accounting principle.   In *Security Mills Co.* v. *Commissioner,* 321 U. S. 281, the taxpayer attempted to reopen a prior year's return so as to deduct amounts which it had subsequently paid out of receipts earned in that year.   Again the Court relied on the annual accounting principle in denying the taxpayer's claim.

ing out its obligations to its members. Until today, that case has been recognized as one that simply held that, in the absence of proof that the proration used by the taxpayer reasonably matched actual expenses with the earning of related revenue, the Commissioner was justified in rejecting the taxpayer's proration. I am hardly alone in thinking that *Michigan* was decided upon the very premise that a realistic deferral of income based upon proof of average costs of service during identifiable periods would be entirely permissible. See *Bressner Radio, Inc.,* v. *Commissioner,* 267 F. 2d 520, 526–529.[9] Such proof was concededly adduced in this case.

As to the enactment and repeal of § 452 and § 462, upon which the Court places so much reliance, there are, at the outset, obvious difficulties in relying on what happened in 1954 and 1955 to ascertain the meaning of § 41 of the 1939 Code. See *Fogarty* v. *United States,* 340 U. S. 8, 13–14; *Gemsco, Inc.,* v. *Walling,* 324 U. S. 244, 265; *Cammarano* v. *United States,* 358 U. S. 498, 510. But these problems aside, I think that the enactment and subsequent repeal of § 452 and § 462 give no indication of Congressional approval of the position taken by the Commissioner in this case. If anything, the legislative action leads to the contrary impression.

The statutory provisions in question were passed as part of a general revision of the internal revenue laws in 1954. Section 452 permitted an accrual basis taxpayer to defer the inclusion of advances in gross income until they were earned.[10] Most significantly, a taxpayer could shift to

---

[9] See also Hoffman, Accounting Treatment Counts in Determining Net Taxable Income, 35 Taxes 918, 921; Behren, Prepaid Income-Accounting Concepts and The Tax Law, 15 Tax L. Rev. 343, 359–360; Note, 67 Yale L. J. 1425, 1439–1440.

[10] There were certain restrictions upon the period over which the advances could be deferred, but these are not relevant for our purposes here. See Proposed Treas. Reg. § 1.452, 20 Fed. Reg. 515;

this method without the consent of the Commissioner. Section 462, which permitted the deduction of anticipated expenses, was not aimed specifically at the problem of reporting advances.[11]   The function of the provisions was to bring "[t]ax accounting . . . more nearly in line with accepted business accounting by allowing prepaid income to be taxed as it is earned rather than as it is received, and by allowing reserves to be established for known future expenses." [12]

In seeking to accomplish this objective, Congress recognized that as a result of "court decisions and rulings," the claim of right approach had been used to require reporting for the year of receipt all payments "subject to free and unrestricted use . . . even though the payments are for goods or services to be provided by the taxpayer at a future time."   H. R. Rep. No. 1337, 83d Cong., 2d Sess.

Wolder, Deduction of Reserves for Future Expenses and Deferring of Prepaid Income, 34 Taxes 524; Bierman and Helstein, Accounting for Prepaid Income and Estimated Expenses under the Internal Revenue Code of 1954, 10 Tax L. Rev. 83, 93–96.   Section 452 specifically envisaged the deferral of club dues.   See H. R. Rep. No. 1337, 83d Cong., 2d Sess. 48.

[11] See, e. g., S. Rep. No. 372, 84th Cong., 1st Sess. 2.   Section 462 provided that, "In computing taxable income for the taxable year, there shall be taken into account (in the discretion of the Secretary or his delegate) a reasonable addition to each reserve for estimated expenses . . . ."   § 462 (a), 68A Stat. 158.   "Estimated expense" was defined as a deduction "(A) part or all of which would . . . be required to be taken into account for a subsequent taxable year; (B) which is attributable to the income of the taxable year or prior taxable years for which an election under this section is in effect; and (C) which the Secretary or his delegate is satisfied can be estimated with reasonable accuracy."   § 462 (d) (1), 68A Stat. 158.   See Bierman and Helstein, Accounting for Prepaid Income and Estimated Expenses under the Internal Revenue Code of 1954, 10 Tax L. Rev. 83, 103–113.

[12] S. Rep. No. 372, 84th Cong., 1st Sess. 3 (quoting from the tax recommendation in the Presidential budget message of 1954).

48, A159.[13]   Congressional awareness of administrative and judicial misapplication of the claim of right doctrine clearly did not imply approval of it.   For by 1954, "[i]t was long recognized that the difficulty lay, not with the statute, but with administrative and court interpretation." [14]   And while the Committee reports contain no express rejection of the Commissioner's interpretation of the 1939 statute, the language used in explaining the need for a change certainly indicates disapproval.[15]

Although § 452 and § 462 were short-lived, the shape of the decisional law with respect to § 41 of the 1939 Code changed considerably during the interval between the passage and repeal of the new sections.   In *Beacon Publishing Co.* v. *Commissioner,* 218 F. 2d 697, the Tenth Circuit rejected the Commissioner's reliance on the claim of right rationale and found that the deferment of

---

[13] There were some exceptions to the rigid application of this rule which had been recognized.   See I. T. 3369, 1940–1 Cum. Bull. 46 (permitting deferred reporting of subscriptions for publishers who had consistently followed that practice) ; I. T. 2080, III–2 Cum. Bull. 48 (1924) (permitting deferment of receipts from sales of tickets for tourist cruises), but compare *National Airlines, Inc.* v. *Commissioner,* 9 T. C. 159.   See also *Veenstra & DeHaan Coal Co.* v. *Commissioner,* 11 T. C. 964; *Summit Coal Co.* v. *Commissioner,* 18 B. T. A. 983.

[14] Freeman, Tax Accrual Accounting for Contested Items, 56 Mich. L. Rev. 727, 729, n. 9.   See Bierman and Helstein, Accounting for Prepaid Income and Estimated Expenses under the Internal Revenue Code of 1954, 10 Tax L. Rev. 83, 84.

[15] "Present law provides that the net income of a taxpayer shall be computed in accordance with the method of accounting regularly employed by the taxpayer, if such method clearly reflects the income and the regulations state that approved standard methods of accounting will ordinarily be regarded as clearly reflecting taxable income. Nevertheless, as a result of court decisions and rulings, there have developed many divergencies between the computation of income for tax purposes and income for business purposes as computed under generally accepted accounting principles. . . ."   H. R. Rep. No. 1337, 83d Cong., 2d Sess. 48.

advances in accord with accrual principles did "clearly reflect . . . income" under § 41. At about the same time a Ninth Circuit decision permitted income received from the sale of goods to be offset by a deduction for the future expense of shipping the goods. *Pacific Grape Products Co.* v. *Commissioner,* 219 F. 2d 862.

When Congress repealed § 452 and § 462, the record shows that it was fully aware of these decisions. Congress recognized that the rationale of these cases would produce a complete reversal of the previous administrative position with respect to the reporting of unearned receipts under § 41 and its counterpart under the 1954 Code, § 446. Congressional intent with respect to this possibility was entirely clear—the trend of judicial decisions should be allowed to run its course *without any inference of disapproval being drawn from the repeal of § 452 and § 462.* This intent was evidenced in the assurances which the House Ways and Means Committee demanded and received from the Secretary of the Treasury, who had sought the repeal of the two sections. In a letter to the Chairman of the Committee, the Secretary stated:

> "My dear Mr. Chairman: This letter will confirm the statements made to you today by Treasury representatives.
>
> .　　　.　　　.　　　.　　　.　　　.
>
> "Furthermore, the Treasury Department will not consider the repeal of section 452 as any indication of congressional intent as to the proper treatment of prepaid subscriptions *and other items of prepaid income, either under prior law or under other provisions of the 1954 code.* In other words, the repeal of section 452 will not be considered by the Department as either the acceptance or the rejection by Congress of the decision in *Beacon Publishing Co. v. Commis-*

*sioner* (218 F. (2d) 697, C. A. 10, 1955) or any other judicial decisions.

"It is my understanding *that the foregoing is consistent with the desire of your committee, with which I agree,* that the repeal of sections 452 and 462 should operate simply to reestablish the principles of law which would have been applicable if sections 452 and 462 had never been enacted." H. R. Rep. No. 293, 84th Cong., 1st Sess. 5. (Emphasis supplied.)

The same viewpoint was expressed in the Senate Report, which stated:

"Another aspect of the uncertainty with respect to subscription income if section 452 is repealed arises from a recent circuit court decision in *Beacon Publishing Company* v. *Commissioner* (C. C. A. 10th, January 3, 1955). The court in this case held that the deferral of prepaid subscription income was in fact proper under the accrual method of accounting. The Secretary of the Treasury in the letter previously referred to which he sent to the chairman of the House Committee on Ways and Means indicated that the repeal of section 452 would not be taken as an indication by the Treasury Department of congressional intent as to the proper treatment of prepaid subscription income under prior law or under other provisions of the 1954 code. He also indicated that the repeal of section 452 will not be considered by the Department as either acceptance or rejection by Congress of the decision in *Beacon Publishing Company* v. *Commissioner* or in any other judicial decisions. . . .

"Uncertainty will also exist in other areas with the repeal of these two provisions. In *Pacific Grape Products* (C. C. A. 9th, February 10, 1955), for example, the circuit court held that certain freight and

shipping expenses incurred after the end of the year could be accrued for tax purposes as of the end of the year. An extension of the principles laid down in this case might well lead the courts in the future to permit the accrual of most estimated expenses which would be covered by section 462 even though this section is repealed." S. Rep. No. 372, 84th Cong., 1st Sess. 5–6.[16]

To my mind, this legislative history shows that Congress made every effort to dissuade the courts from doing exactly what the Court is doing in this case—drawing from the repeal of § 452 an inference of Congressional disapproval of deferred reporting of advances.[17] But even if the legislative history on this point were hazy, the same conclusion would have to be reached upon examination of Congressional purpose in repealing § 452 and § 462. Cf. *United States* v. *Benedict,* 338 U. S. 692, 696. For the fact of the matter is, contrary to the impression left by the Court's opinion, that the reasons for rejecting § 452 and § 462 were entirely consistent with accepting the deferred reporting of receipts in a case like this. Sections 452 and 462 were repealed *solely* because of a prospective loss of revenue during the first year in which taxpayers would take advantage of the new sections.[18] Insofar as the reporting of advances was concerned, that

---

[16] See also H. R. Rep. No. 293, 84th Cong., 1st Sess. 4–5.

[17] It is to be noted that no such inference was relied upon in the *Michigan* case, although the same arguments with respect to §§ 452 and 462 were pressed upon the Court by the Government. See Brief for Respondent, pp. 62–65, *Automobile Club of Michigan* v. *Commissioner,* 353 U. S. 180.

[18] See H. R. Rep. No. 293, 84th Cong., 1st Sess. 2–5; S. Rep. No. 372, 84th Cong., 1st Sess. 4–5; Hearings Before the Senate Finance Committee on H. R. 4725, 84th Cong., 1st Sess. 6. The prospective loss was more than ten times the original estimate of 47 million. *Ibid.* See Note, 67 Yale L. J. 1425, 1432, n. 25.

loss of revenue would have occurred solely as a consequence of taxpayers changing their method of reporting, without the necessity of securing the Commissioner's consent, to that authorized under § 452 and § 462.[19] The taxpayer who shifted his basis for reporting advances would have been allowed what was commonly termed a "double deduction" during the transitional year.[20] Under § 462, deductions could be taken in the year of change for expenses attributable to advances taxed in prior years under a claim of right theory, as well as for reserves for future expenditures attributable to advances received and reported during that year. Similarly, under § 452, prepayments received during the year of transition would be excluded from gross income while current expenditures attributable to past income would still be deductible.[21]

The Congressional purpose in repealing § 452 and § 462—maintenance of the revenues—does not, however, require disapproval of sound accounting principles in cases of taxpayers who, like the petitioner, have customarily and regularly used a sound accrual accounting method in reporting advance payments. No transition

[19] There was also a problem of expanded use of reserves for estimated expenditures under § 462 for items like vacation pay which were not related to the reporting of advances. See Hearings Before the Senate Finance Committee on H. R. 4725, 84th Cong., 1st Sess. 5, 9; Sporrer, The Past and Future of Deferring Income and Reserving for Expenses, 34 Taxes 45, 55–56; Griswold, Federal Taxation (5th ed. 1960), 497–498.

[20] See S. Rep. No. 372, 84th Cong., 1st Sess. 4; Hearings Before the Senate Finance Committee on H. R. 4725, 84th Cong., 1st Sess., at 7, 8, 10; Dakin, The Change from Cash to Accrual Accounting for Federal Income Tax Purposes—Pyramided Income, Double Deductions and Double Talk, 51 Nw. U. L. Rev. 515, 530–538; Griswold, Federal Taxation (5th ed. 1960), 497–498; Note, 67 Yale L. J. 1425, 1430.

[21] Only one-tenth of the estimated loss during the transitional year was attributable to § 452. See Hearings Before the Senate Finance Committee on H. R. 4725, 84th Cong., 1st Sess. 21.

is involved, and no "double deduction" is possible. Moreover, taxpayers formerly reporting advances as income in the year of receipt can now shift to a true accrual system of reporting only with the approval of the Commissioner. See Treas. Reg. 111, § 29.41–2 (1943); Treas. Reg. 118, § 39.41–2 (c)(1953); Int. Rev. Code of 1954, § 446 (e).[22] Before giving his approval the Commissioner can be expected to insist upon adjustments in the taxpayer's transition year to forestall any revenue loss which would otherwise result from the change in accounting method. See *Kahuku Plantation Co.* v. *Commissioner,* 132 F. 2d 671, 674; 2 Mertens, Law of Federal Income Taxation, §§ 12.21, 12.21a. Cf. *Brown* v. *Helvering,* 291 U. S. 193, 204.

In short, even if the legislative history of the repeal of § 452 and § 462 did not clearly indicate, as it does, that the repeal of those sections should have no bearing upon judicial determination of whether the deferred reporting of advances "clearly reflects income," the purpose of the Congress which repealed those provisions would lead to the same conclusion. It need hardly be added that the subsequent legislative activity cited by the Court in no way alters this conclusion. Contrary to the Court's suggestion, the "relief that the Association seeks in this Court" is far short of what was sought in 1958 in urging that the coverage of § 455 be extended to prepaid automobile club membership dues. As enacted, § 455 was not limited in application to publishers previously reporting prepaid subscriptions on a deferral basis. See I. T. 3369, 1940–1 Cum. Bull. 46. It applied to all publishers using the accrual method and permitted a change

---

[22] See also Treas. Reg. § 1.446–1 (e) (2) (1957); *Brown* v. *Helvering,* 291 U. S. 193, 204–205; *Advertisers Exchange, Inc.* v. *Commissioner,* 25 T. C. 1086; 2 Mertens, Law of Federal Income Taxation, §§ 12.19–12.20.

to deferred reporting of subscriptions for the year 1958 *without consent* of the Commissioner. 26 U. S. C. § 455 (c)(3)(B).

## II.

I think the Government's position in this case is at odds with the statutes,[23] regulations,[24] and court decisions,[25]

[23] The Revenue Act of 1913, 38 Stat. 114, provided only for a strict cash receipts and disbursements method of accounting. See *e. g.*, § II B, 38 Stat. 167. In the 1916 Act, the sections dealing with permissible methods of computing income were revised to provide that:

"A corporation . . . keeping accounts upon any basis other than that of actual receipts and disbursements, unless such other basis does not clearly reflect its income, may, subject to regulations made by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, make its return upon the basis upon which its accounts are kept, . . ." § 13 (d), 39 Stat. 771. See also § 8 (g), 39 Stat. 763 (identical provision with respect to returns filed by individuals).

These sections were designed specifically to permit accrual accounting. See H. R. Rep. No. 922, 64th Cong., 1st Sess. 4; *United States* v. *Anderson,* 269 U. S. 422, 439–441. In the Revenue Act of 1918, the necessity of obtaining special permission to use the accrual method was omitted, see § 212 (b), 40 Stat. 1064–1065, and the provision permitting the use of accrual accounting remained substantially the same for the next thirty-six years. See Int. Rev. Code of 1939, § 41, 53 Stat. 24; *Reubel* v. *Commissioner,* 1 B. T. A. 676, 677–678. In 1954 the pertinent provision was again changed, with specific mention of the "accrual method." See Int. Rev. Code of 1954, § 446, 26 U. S. C. § 446. See generally May, Accounting and the Accountant in the Administration of Income Taxation, 47 Col. L. Rev. 377, 380–382.

[24] See, *e. g.*, T. D. 2433, 19 Treas. Dec. 5 (1917); Treas. Reg. 45, Art. 23, Art. 111 (1920); Treas. Reg. 118, § 39.41 (1953); Treas. Reg. § 1.446–1 (1957).

[25] See, *e. g.*, *United States* v. *Anderson,* 269 U. S. 422; *Niles Bement Pond Co.* v. *United States,* 281 U. S. 357; *Aluminum Castings Co.* v. *Routzahn,* 282 U. S. 92; *Spring City Co.* v. *Commissioner,* 292 U. S. 182, 184–185; see also *Weed & Brothers* v. *United States,* 69 Ct. Cl. 246, 251–257, 38 F. 2d 935, 938–940.

which, since 1916, have recognized that realistic accrual accounting does "clearly reflect income." If I am correct, the law did not give the Commissioner any "discretion . . . not to accept the taxpayer's accounting system."

The basic concept of including advances in gross income only as they are earned is but an aspect of accrual accounting principles which have consistently received judicial approval. We have, for example, often recognized that deductions for business expenses must be reported as soon as the obligation to pay becomes "certain." See, *e. g.*, *United States* v. *Anderson,* 269 U. S. 422; *American National Co.* v. *United States,* 274 U. S. 99; *Niles Bement Pond Co.* v. *United States,* 281 U. S. 357, 360; *United States* v. *Olympic Radio & Television,* 349 U. S. 232, 236. This may be before or after cash payment is made,[26] or even before it is due.[27] The controlling factor is not the flow of cash, but the "economic and bookkeeping" principles with which § 41 is concerned. *United States* v. *Anderson, supra,* at 441. See also *American National Co.* v. *United States, supra.* These principles are at the foundation of the so-called "all events" test for determining the accrual of deductions. See *United States* v. *Anderson, supra,* at 441;[28] *United States* v. *Consoli-*

---

[26] Compare, *e. g., Aluminum Castings Co.* v. *Routzahn,* 282 U. S. 92 (deduction taken in year prior to cash disbursement) with *Shelby Salesbook Co.* v. *United States,* 104 F. Supp. 237 (deduction taken in later year).

[27] *United States* v. *Anderson,* 269 U. S. 422; *American National Co.* v. *United States,* 274 U. S. 99; *Aluminum Castings Co.* v. *Routzahn,* 282 U. S. 92.

[28] The Court there held that an accrual taxpayer should have deducted a tax expense in 1916 so that it properly could have been offset against the profits from sales in 1916 upon which the tax was levied. The Court rejected the contention that the tax could not accrue in 1916 because it was not due until 1917. It stated:

"In a technical legal sense it may be argued that a tax does not accrue until it has been assessed and becomes due; but it is also true that in advance of the assessment of a tax, all the events may

*dated Edison Co.,* 366 U. S. 380, 384–386. The same principles are applicable to the accrual of income. See *Continental Tie & L. Co.* v. *United States,* 286 U. S. 290. As has been correctly noted, "[i]t is a necessary corollary of this 'economic and bookkeeping' proposition" upon which *Anderson* rested that receipts are not reportable in income until "substantially 'all the events' have occurred, both as to the cost and time of performance, which must occur in order to discharge the liability to perform which was given by [the taxpayer] in return for the receipt." *Bressner Radio, Inc.,* v. *Commissioner,* 267 F. 2d 520, 524. See also *United States* v. *Anderson, supra,* at 440; *Beacon Publishing Co.* v. *Commissioner,* 218 F. 2d 697, 699. Indeed, "accrual" of income has been commonly defined in terms of "earnings" from the sale of goods or the performance of services. See, *e. g., Spring City Co.* v. *Commissioner,* 292 U. S. 182, 184–185; Stanley and Kilcullen, The Federal Income Tax (3d ed. 1955), 190.[29] In reject-

---

occur which fix the amount of the tax and determine the liability of the taxpayer to pay it. In this respect, for purposes of accounting and of. ascertaining true income, for a given accounting period, the munitions tax here in question did not stand on any different footing than other accrued expenses appearing on appellee's books. In the economic and bookkeeping sense with which the statute and Treasury decision were concerned, the taxes had accrued. It should be noted that § 13 (d) makes no use of the words 'accrue' or 'accrual' but merely provides .for a return upon the basis upon which the taxpayer's accounts are kept, if it reflects income—which is precisely the return insisted upon by the Government." 269 U. S., at 441.

[29] The authors there state:

"In the ordinary case, accrual precedes actual receipt since there is an accrual when there is a *right* to receive. But in some cases items are received before they are earned, and then the receipt precedes the accrual."

See also *Continental Tie & L. Co.* v. *United States,* 286 U. S. 290; *Georgia School-Book Depository, Inc.* v. *Commissioner,* 1 T. C. 463; 1961 C. C. H. Tax Reporter § 2820.025 ("On the accrual basis, income is reported when earned"); Freeman, Tax Accrual Acounting for Contested Items, 56 Mich. L. Rev. 727, 728.

ing petitioner's method of allocating prepaid advances, the Court, I think, disregards these basic principles.

The net effect of compelling the petitioner to include all dues in gross income in the year received is to force the petitioner to utilize a hybrid accounting method—a cash basis for dues and an accrual basis for all other items. *Schlude* v. *Commissioner,* 283 F. 2d 234, 239. Cf. *Commissioner* v. *South Texas Co.,* 333 U. S. 496, 501. For taxpayers generally the enforcement of such a hybrid accounting method may result in a gross distortion of actual income, particularly in the first and last years of doing business. On the return for the first year in which advances are received, a taxpayer will have to report an unrealistically high net income, since he will have to include unearned receipts, without any offsetting deductions for the future cost of earning those receipts. On subsequent tax returns, each year's unearned prepayments will be partially offset by the deduction of current expenses attributable to prepayments taxed in prior years. Even then, however, if the taxpayer is forbidden to correlate earnings with related expenditures, the result will be a distortion of normal fluctuations in the taxpayer's net income. For example, in a year when there are low current expenditures because of fewer advances received in the preceding year, the result may be an inflated adjusted gross income for the current year. Finally, should the taxpayer decide to go out of business upon fulfillment of the contractual obligations already undertaken, in the final year there will be no advances to report and many costs attributable to advances received in prior years. The result will be a grossly unrealistic reportable net loss.

The Court suggests that the application of sound accrual principles cannot be accepted here because deferment is based on an estimated rate of earnings, and because this estimate, in turn, is based on average, not

individual, costs. It is true, of course, that the petitioner cannot know what service an individual member will require or when he will demand it. Accordingly, in determining the portion of its outstanding contractual obligations which have been discharged during a particular period (and hence the portion of receipts earned during that period), the petitioner can only compare the total expenditures for that period against estimated average expenditures for the same number of members over a full contract term. But this use of estimates and averages is in no way inconsistent with long-accepted accounting practices in reflecting and reporting income.

As the Government has pointed out in past litigation, "many business concerns . . . keep accounts on an accrual basis and have to estimate for the tax year the amount to be received on transactions undoubtedly allocable to such year." *Continental Tie & L. Co.* v. *United States,* 286 U. S. 290, 295–296. Similarly, the deduction of future expenditures which have already accrued often requires estimates like those involved here. See, *e. g., Harrold* v. *Commissioner,* 192 F. 2d 1002; *Schuessler* v. *Commissioner,* 230 F. 2d 722; *Denise Coal Co.* v. *Commissioner,* 271 F. 2d 930, 934–937; *Hilinski* v. *Commissioner,* 237 F. 2d 703. Finally, it is to be noted that the regulations under both the 1939 and 1954 Codes permit various methods of reporting income which require the use of estimates.[30] In the absence of any showing that the estimates used here were faulty, I think the law did not

---

[30] See, *e. g.,* Treas. Reg. 111, § 29.42–4 (1943), Treas. Reg. 118, § 39.42–4 (1953), and Treas. Reg. § 1.451–3 (1957) (providing for the percentage of completion method of reporting income on long-term contracts); Treas. Reg. 111, § 29.42–5 (1943), Treas. Reg. 118, § 39.42–5 (1953), and Treas. Reg. § 1.451–4 (1957) (providing for the deduction for redemption of trading stamps based upon "The rate, in percentage, which the stamps redeemed in each year bear to the total stamps issued in such year"). See generally *Brown & Williamson Tobacco Corp.* v. *Commissioner,* 16 T. C. 432.

permit the Commissioner to forbid the use of standard accrual methods simply upon the ground that estimates were necessary to determine what the rate of deferral should be.

Similarly, it is not relevant that the petitioner "defers receipt . . . of dues to a taxable period in which no, some, or all the services paid for by those dues may or may not be rendered." The fact of the matter is that what the petitioner has an obligation to provide, *i. e.*, the constant readiness of services if needed, will with certainty be provided during the period to which deferment has been made. Averages are frequently utilized in tax reporting. In computing the value of work in process, in distributing overhead to product cost, and in various other areas, the use of averages has long been accepted. See, *e. g., Rookwood Pottery Co.* v. *Commissioner,* 45 F. 2d 43; *Eatonville Lumber Co.* v. *Commissioner,* 10 B. T. A. 232. The use of an "average cost" is particularly appropriate here where the dues are earned by making services continuously available. The cost of doing so must necessarily be based on composite figures.

For these reasons I think that the petitioner's original returns clearly reflected its income, that the Commissioner was therefore without authority under the law to override the petitioner's accounting method, and that the judgment should be reversed.