Beverley J. Sandegren v. Commissioner.Sandegren v. CommissionerDocket No. 76622.United States Tax CourtT.C. Memo 1962-16; 1962 Tax Ct. Memo LEXIS 288; 21 T.C.M. (CCH) 77; T.C.M. (RIA) 62016; January 30, 1962*288 Petitioner operated a dance studio and entered into contracts with students whereby she agreed to furnish dancing instruction and the students agreed to pay for the same. In some instances students would make a down payment and pay the balance in installments. Separate budget plan contracts would be signed by the students in such cases. The budget plan contracts were assigned by petitioner to the Educational Credit Bureau, with full recourse. The Educational Credit Bureau received 10 percent of all amounts collected on the installment contracts. The Educational Credit Bureau, upon receipt of the contracts, forwarded a set percentage of the balance (either 40 or 50 percent) to petitioner and posted the remainder of such balance to a liability account on their books in favor of petitioner. Petitioner did not enter this balance in the liability reserve on her books. At the close of each taxable period, petitioner determined unearned income from student record cards representing lessons contracted for but untaught and did not include such amount in earned income. Held, for the Commissioner. For tax accounting purposes, income accrued at the time a contract was entered under the authority*289 of Mark E. Schlude, 32 T.C. 1271 (1959), revd. 283 F. 2d 234 (C.A. 8, 1960), vacated and remanded 367 U.S. 911 (1961), rehearing denied 368 U.S. 873 (1961), vacated 283 F. 2d 234 and affd. Tax Court F. 2d . Petitioner's gross income for each of the periods here involved for tax purposes includes increases in the balance of the deferred income account and increases in the reserve account held by the Educational Credit Bureau. Woolvin Patten, Esq., Hoge Bldg., Seattle, Wash., for the petitioner. Norman H. McNeil, Esq., for the respondent. BLACKMemorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's income tax as follows: Year or PeriodDeficiency1952$ 597.6719531,765.671/1 to 9/30/542,303.389/30/55355.629/30/562,170.42Petitioner claims an overpayment in the amount of $31.61 for the fiscal period January 1 to September 30, 1954, and petitioner elects to take a standard deduction for 1953 providing such course proves to be beneficial to petitioner. Respondent claimed an increased deficiency in the amount of $122.16 for the*290 fiscal year ended September 30, 1955. The calendar year 1952 is involved only because of the determination by respondent that petitioner did not sustain a net operating loss for the taxable year 1953. It has been stipulated that respondent's determinations of deficiencies are overstated due to certain duplications of income, specifically covered in the Findings of Fact. Respondent based the above deficiencies upon a redetermination of petitioner's income for each of the years here involved by adding thereto certain increases in the balance of a deferred income account and in the balance of petitioner's reserve funds withheld by the Educational Credit Bureau. In his deficiency notice, the Commissioner stated his adjustments to the income reported by petitioner in her returns as follows: It has been determined that your taxable income was understated by your improper deferral or failure to include in income: (a) certain cash receipts attributable to payments by pupils or students on contracts for dancing lessons and the proceeds of the sale or assignment of such contracts to the Educational Credit Bureau, Inc. and, (b) certain amounts not actually received but attributable*291 to your profit upon the sale or assignment of contracts for dancing lessons to the Educational Credit Bureau, Inc., wherein, the Bureau remitted a portion of the purchase price for the contract to you less a 10% finance charge, but withheld a percentage of the face value of the contract as security, placing such withheld amount in a reserve account. The amounts so deferred and not included by you in taxable income for the taxable years or periods here involved are as follows: (a) Total unreportedcontract proceeds re-(b) Total unreportedceived in the taxableproceeds being with-TotalYear oryear but deferred byheld by the CreditIncreasePeriodyou to a subsequentBureau on contractsto TaxableEndedyearassigned by youIncome12-31-53$ 6,483.61$4,276.80$10,760.411- 1-54 to9-30-544,132.214,501.478,633.689-30-554,522.64831.495,354.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,524.6255.1410,579.76(a) Regarding unreported actual receipts during the years here involved, it is held that such payments were received by you under a claim of right, without restriction as to their disposition and, further, that your method of accounting*292 therefor does not clearly reflect your income. Consequently your taxable income is increased to reflect such amounts in each of the taxable years or periods here involved. (b) Regarding unreported contract proceeds attributable to your sale or assignment of contracts for dancing lessons to the Educational Credit Bureau, Inc., it is held that the amounts withheld by the Bureau at the end of each taxable year or period here involved are includible in your taxable income because, at the time the contract for dancing lessons is executed by the parties, you have an enforceable right to receive the whole of the contract price. As you are on an accrual basis, the entire sales price should be accrued at that time regardless of when received. Therefore your taxable income is increased to reflect such amounts, less finance charge, withheld and placed in a reserve account by the Bureau in each of the taxable years or periods here involved. It is held that no net operating loss deduction is allowable for the calendar year 1952. The issues presented are: Whether petitioner's teaching income should be increased by such amounts in the unearned income account and reserve account; whether petitioner*293 is entitled to establish a contingency reserve and/or a reserve for bad debts in the event respondent is sustained as to the first issue; and whether petitioner sustained a net loss from operation of the studio for 1953 and thereby is entitled to a net operating loss carryback deduction for the year 1952. Findings of Fact Most of the facts have been stipulated and they are incorporated herein by this reference. Only such facts from the stipulation and exhibits will be stated herein as seem necessary to an understanding of the issues to be decided. Petitioner Beverley J. Sandegren, a resident of Yakima, Washington, filed her individual Federal income tax returns for the calendar years 1952 and 1953 and for the fiscal years ended September 30, 1954, 1955, and 1956, with the district director of internal revenue for the district of Washington. Petitioner, a widow, had been employed from 1945 until 1953 as a teacher and manager by G. R. and Helen Van Ness, a copartnership, sometimes hereinafter called the Van Ness copartnership, which held a number of franchises for the operation of dance studios in the State of Washington from Arthur Murray, Inc. In 1953, petitioner obtained*294 a subfranchise, under the Van Ness copartnership, authorizing her to operate an Arthur Murray Studio in Yakima, Washington. As sole proprietor, petitioner opened a studio in June 1953 for the purpose of giving private ballroom dancing instruction. This proprietorship will sometimes hereinafter be referred to as the Yakima Studio. Arthur Murray, Inc., is a national organization with a recognized name and method of dance instruction. Petitioner agreed to pay the Van Ness copartnership 10 percent of weekly cash receipts of the Yakima Studio in exchange for the right to use the Arthur Murray name and methods and for the other services and privileges offered by the Arthur Murray organization. These payments are not here in controversy. Under her subfranchise agreement petitioner was required, among other things, to maintain the minimum hourly tuition rates established by the licensor, to conduct her studio in accordance with the licensor's policies and practices, to send her instructors to the licensor for periodic refresher courses of instruction, to honor the unused portion of courses of students enrolled at other Arthur Murray Studios, to employ only instructors whose qualifications*295 had been approved by the licensor, to pay her instructors the minimum wages established by the licensor, to maintain a studio whose appearance, decoration, furniture, and equipment were satisfactory to the licensor, to keep adequate books of account, and to bear certain advertising expenses. Arthur Murray, Inc., both directly and through the Van Ness copartnership supervised the operation of petitioner's studio to assure itself that the Yakima Studio was conducted in accordance with the terms of the franchise. Weekly reports were submitted by the Yakima Studio to Arthur Murray, Inc., and to the Van Ness copartnership. The hourly rates for instruction at the Yakima Studio varied according to the number of hours for which a student enrolled. The time of instruction at the Yakima Studio was either agreed upon at the time of enrollment or informally arranged between the student and the instructor. Usually such instruction was completed within 10 months after the date of enrollment. Students enrolled at the Yakima Studio could elect to take their instruction at any studio operating under an Arthur Murray franchise. One person enrolled at the Yakima Studio during the period here in question*296 under what is known as a lifetime enrollment. This is an enrollment for 1,200 hours of instruction upon the completion of which the student is entitled to 2 hours of instruction per month and certain training and social privileges for life. Two basic types of financial arrangements were made with students at the Yakima Studio for payment for their instruction. One arrangement was for the student to pay cash at the time of enrollment. The other and more frequently used arrangement was for the student to pay 10 percent of the amount at the time of enrollment and the remainder in installments of definite amounts. This latter arrangement is sometimes hereinafter referred to as the budget plan. Under both arrangements, at the time of enrollment, the student signed an agreement on a form employed by Arthur Murry Studios for a specified number of hours of instruction. The student agreed in writing to pay the total tuition computed from hours for which he had enrolled. The Yakima Studio agreed to furnish him the hours of instruction covered by the agreement. This enrollment agreement contained the legend "I understand no refunds will be made under the terms of this contract," and stated*297 in large letters at the bottom "NON CANCELLABLE CONTRACT." Petitioner also utilized forms for extension agreements and renewal agreements which contained the same notations. Students who enrolled under the budget plan signed an additional document under which the student agreed (1) to take the hours of instruction covered by his enrollment, and (2) to pay the balance of the tuition for such instruction in 10 or less monthly installments to the Educational Credit Bureau, Inc., a Missouri corporation. This organization will sometimes hereinafter be referred to as E.C.B. Petitioner had an agreement with E.C.B. for obtaining funds on budget plan enrollments. She endorsed such agreements with full recourse and assigned them to E.C.B. Between July 20, 1953, and April 30, 1954, upon receipt of this document, E.C.B. transmitted to petitioner 50 percent of the tuition balance and posted 40 percent of such balance to a liability account carried on their books in favor of petitioner. After April 30, 1954, E.C.B. advanced petitioner only 40 percent of such balance and posted the remaining 50 percent to the liability account. E.C.B. was paid 10 percent of the amount actually collected from*298 the student for its services. As to this 10 percent payment there is no controversy as to its deductibility; the Commissioner has not undertaken to tax it. E.C.B. was not responsible for defaults and petitioner was obligated and did repurchase any budget plan agreement in default within 20 days after notification of default by E.C.B. However, in actual practice, repurchases were usually offset against advances to petitioner on new budget plan enrollments. E.C.B. usually made one or two attempts by correspondence to collect payments in default. Except for the information submitted by students on the budget plan agreement, no further credit investigation was made of students signing such agreements. During the period here in question, approximately one-half of the total number of the budget plan contracts was canceled in whole or in part for nonpayment or otherwise. When a budget plan agreement was returned to petitioner no attempt was made to collect any greater sum of money from the student than the amount due the Yakima Studio for the hours of instruction actually given. Although the contracts stated they were noncancellable, petitioner on request refunded students any amounts*299 they had paid in excess of the amount due for the hours of instruction they actually received. However, refunds were not made unless a request therefor was received from the student. For the taxable year 1953 and subsequent taxable peiods, teaching income was reported on an accrual basis. However, as will hereinafter appear, petitioner and respondent differ as to how and when accruals should be made on the books and records of petitioner. All funds received by the Yakima Studio either directly from students or from E.C.B. were deposited in the general bank account of the Yakima Studio and used by petitioner without restriction. Income was recorded by petitioner in the period when lessons were taught and expenses were recorded in the period when incurred. Income from cancellations of contracts accumulated until September 1956, at which time petitioner recorded such as income. Thereafter payments in excess of instruction given were recorded to income after 9 months of inactivity. Income would result from a cancellation if the amounts paid were in excess of lessons taught and there had been no demand for a refund. When a contract was entered into with a student, petitioner made*300 no entry on the books except to credit a "Teaching Income" account with the amount of the down payment received or the amount of the cash receipt, the debit would be to the "Cash" account. When a contract was sold or assigned to E.C.B., the advances from E.C.B. were recorded in the same manner, a credit to "Teaching Income" and a debit to "Cash." Petitioner does not utilize an account or contract receivable for interim postings. Through the accounting period, petitioner merely posts all cash receipts to the "Teaching Income" account. As lessons were given, entries recording the lessons were made on student record cards. Petitioner maintained no account with respect to her reserve at E.C.B.; however, frequent status reports were sent by E.C.B. to the Yakima Studio. At the close of the taxable period each year petitioner made an analysis of the student cards. The cards reflected the total cash received, the number of hours actually given, and the rate per hour in each case. From this inventory, petitioner determined the amounts to enter in the "Due from Pupils" and "Unearned Income" accounts depending upon relation between cash receipts and number of lessons actually taken. Petitioner*301 then made closing entries to the interim "Teaching Income" account (wherein all cash receipts were initially posted) to decrease it for total unearned income and increase it for total amounts due from pupils so that, for record and tax return purposes, petitioner determined the balance of unearned or deferred teaching income for each period and reported the adjusted balance of the "Teaching Income" account as gross sales or income. In adjusting the "Teaching Income" account to reflect taxable income on the basis of hours of instruction actually given, petitioner reported as taxable gross income amounts due from pupils although not received. Such reported amounts, so far as they were reflected in the closing balances of the deferred income account and the Yakima Studio reserve at E.C.B., were duplicated by respondent in the statutory notice. The following duplications of taxable income resulted: Calendar Year 1953$ 405.631/1-9/30/541,759.92F/Y/E 9/30/55(589.14)F/Y/E 9/30/56333.64The following schedule reflects the balances held by E.C.B. as a liability reserve in favor of petitioner: ClosingYear's Ad-BalanceditionCalendar Year 1953$4,276.80$4,276.801/1-9/30/548,778.274,501.47F/Y/E 9/30/559,609.76831.49F/Y/E 9/30/569,664.9055.14*302 The following schedule reflects cancellations or defaults resulting in reductions or offsets to the reserve held by E.C.B. compared to total sales after deduction of the E.C.B. finance charge: Offsets orTotal sales,reduc-after dis-tions toPer-countreservecentCalendar Year 1953$19,411.01$2,362.8712.21/1-9/30/5431,598.034,036.0612.8F/Y/E 9/30/5538,486.353,649.879.5F/Y/E 9/30/5650,232.103,178.546.4Petitioner's method of accounting followed accepted principles of commercial accounting used by the Arthur Murray Dance Studios. Petitioner's method of accounting, for convenience, is termed the unit system and respondent's method is termed the executed contract method. The parties have stipulated as follows: XIII. The unit system of accrual accounting described in the preceding paragraphs, while somewhat different in its mechanics, is in its essential elements identical with the method of accounting described by the Court in the case of Schlude v. Commissioner, 32 T.C. No. 124. As examples of the method used by petitioner in her income tax accounting the parties have stipulated as follows: *303 For example (Joint Exhibit S-19, page 1, line 1) on November 28, 1953 Roderick Asher enrolled for 25 hours of instruction at $10.36 per hour. During 1953 Asher paid the Studio $29.00 and the Studio received $115.00 on his account from Educational Credit Bureau or a total of $144.00. During 1953 he received 3 hours of instruction. The hours of instruction (3) multiplied by the agreed hourly rate ($10.36) is $31.08. This amount being $112.92 less than the amount received from Asher, $112.92 is posted to "unearned income" and the interim posting of income ($144.00) reduced by such amount. The net effect is that $31.08 is taken into income as result of the enrollment of Asher. For example of the handling of "Due from Pupil" items (Joint Exhibit S-19, page 1, line 4) on August 1, 1953 David Austin also enrolled for 25 hours of instruction at $10.36 per hour. During 1953 the Studio also received from the same sources a total of $144.00 for his account. However during 1953 Austin received 20 hours of instruction. The hours of instruction (20) multiplied by the agreed hourly rate ($10.36) is $207.20 or $63.20 more than was received from Austin. This $63.20 is posted to "Due from Pupil" *304 and the interim posting of income ($144.00) increased by such amount. Again the teaching income in the case of Austin as finally recorded and reported for tax purposes is $207.20, i.e. 20 X $10.36, or $144.00 + $63.20. No net operating loss resulted in 1953 and, accordingly, respondent's disallowance of the claimed loss carryback deduction for that year and determination of a deficiency in income tax for 1952 are proper. During the short fiscal year ended September 30, 1954, petitioner made the following expenditures which are allowable as itemized deductions: Contributions$125.25Interest289.18Taxes235.00Total$649.43Opinion BLACK, Judge: The first issue presented herein is controlled by our decision in Mark E. Schlude, 32 T.C. 1271 (1959), revd. 283 F. 2d 234 (C.A. 8, 1960), vacated and remanded 367 U.S. 911 (1961), rehearing denied 368 U.S. 873 (1961), vacated 283 F. 2d 234 and affd. Tax Court F. 2d . The parties have stipulated, as stated in our Findings of Fact, that the unit system of accrual accounting utilized by petitioner, while somewhat different in its mechanics, is in*305 its essential elements identical with the method of accounting described by this Court in the Schlude case. The essential facts are undistinguishable. In both the Schlude case and the present case the taxpayers, following what is contended as accepted methods of commercial accounting, reported income in the period when lessons were taught and maintained an unearned income account or a deferred income account representing a total of lessons contracted for but not taken (untaught lessons). The number of untaught lessons multiplied by the contract rate per lesson represents the amounts held in the deferred account. Unlike the Schlude case, under the method of accounting utilized by petitioner, unearned income and the amounts due from pupils (taught lessons, but unpaid) were determined initially from an examination of student record cards and the interim teaching income account was adjusted by these determinations. The balances in the interim teaching income account were reported as gross sales or income. This technique is described more fully in the Findings of Fact. In the Schlude case, earned income was determined initially from the data found on the student cards by multiplying the*306 total number of taught lessons by the designated rate per lesson for each contract. This amount was then charged to deferred income and credited to earned income. Another difference is that petitioner herein did not maintain any account with respect to her liability reserve at E.C.B., whereas in the Schlude case the taxpayer apparently treated the amount withheld by their bank as a memorandum accounts receivable. After a careful examination of the record we conclude that there are no essential differing facts or accounting procedures used by petitioner that would distinguish the instant case from the Schlude case. Petitioner's argument and brief, heard and submitted before the Supreme Court rendered its decision in the Schlude case, were based on the theory that Schlude was incorrectly decided by the Tax Court. However, since that time the history of the Schlude case in the appellate courts indicates that petitioner's position is incorrect. On October 19, 1960, the United States Court of Appeals for the Eighth Circuit reversed the decision of the Tax Court in the Schlude case and held that under appropriate circumstances where the taxpayer's accounting method clearly reflects income*307 it is proper to defer income received for future dancing lessons. We had previously held that the taxpayer must accrue the amount of the contract price for lessons in the tax period in which the contract was entered. The Supreme Court granted certiorari and in a per curiam decision vacated and remanded the case for further consideration in the light of American Automobile Association v. United States, 367 U.S. 687 (1961). The Supreme Court's original mandate did not contain the words "for further consideration" and had flatly reversed and remanded the case. On December 15, 1961, the Eighth Circuit, following the Supreme Court's denial of rehearing in the Schlude case and the issuance of its mandate, entered the following decision: Per Curiam: For the second time this case is here for determination. Our first opinion, * * * 283 F. 2d 234, reversed the decision of the Tax Court. On June 19, 1961, the Supreme Court of the United States rendered its decision in American Automobile Association v. United States * * * 367 U.S. 687. On the same day the Supreme Court, by per curiam order in this case, directed that "(the) judgment is vacated and the*308 case is remanded in light of American Automobile Association v. United States * * *," Commissioner * * * v. Schlude * * * 367 U.S. 911. On October 9, 1961, in denying petition for rehearing, the Supreme Court amended its per curiam order of June 19, 1961, as follows: "The judgment is vacated and the case is remanded for further consideration in the light of American Automobile Association v. United States * * *." (Italics supplied.) Pursuant to our invitation, counsel for petitioners and the Commissioner filed supplemental briefs and presented oral arguments directed largely to the question of whether this case falls within the ambit of the teachings of American Automobile Association, supra. In light of that case we have carefully examined and considered petitioners' method of accrual accounting and are convinced that such method does not, for income tax purposes, clearly reflect income. Accordingly, our judgment previously entered is vacated, and the decision of the Tax Court is affirmed. The decision of the Eighth Circuit is self-explanatory and it can be seen that it now affirms the Tax Court and since we have found no essential distinctions between*309 the facts in the Schlude case and the instant case, we follow Schlude as to the first issue. For income tax accounting purposes petitioner must include the balances in the unearned income account and in her reserve at E.C.B. in income. Since we have sustained respondent as to the first issue, we must dispose of the question as to whether or not petitioner is entitled to establish a contingency reserve for untaught lessons due pupils and/or a reserve for bad debts in some reasonable amount against the unpaid contract balances outstanding at the end of the taxable periods here in issue. Petitioner does not formally raise this issue on brief even though the question was presented in the alternative in the petition and amendment thereto. As to a contingency reserve, the facts indicate that cancellations were considerable in number and amount. Cancellations or defaults resulting in reductions or offsets to the E.C.B. reserve account when compared to total sales in dollars appear to range from 6.4 to 12.8 percent. This issue was also discussed in the Schlude case where the rate of cancellations ranged from 15 to 19 percent of sales. In the Schlude case we held that a rate of cancellation*310 of 17 percent of sales on the average would not provide a sufficient basis for a finding that there was a real uncertainty that the amounts due under any one or all of the contracts would be uncollectible at the time the contracts were entered into. In the instant case the rate of cancellation is even less than that found in the Schlude case and we hold that the proper manner of providing for this type of contingency is through the use of a bad debt reserve. Since petitioner has not claimed deductions for specific bad debts and there is no evidence that she has elected to use a reserve for bad debts as required by sec. 1.166, Income Tax Regs., we hold for the respondent on this issue. In view of the fact that we have sustained respondent as to the first two issues, it will follow that respondent's disallowance of the loss carryback deduction for 1952 is proper. Decision will be entered under Rule 50.