**RCA CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 69–Civ. 2633.

United States District Court, S. D. New York.

Aug. 14, 1980.

LASKER, District Judge.

RCA Corporation ("RCA") sues for a refund of nearly $6,000,000 of federal income taxes it paid for 1958 and 1959, plus deficiency interest paid and interest accrued on these amounts. After lengthy but unsuccessful efforts to negotiate a settlement, as well as time–consuming meetings to reach agreement on the facts, the parties executed a comprehensive stipulation of facts. At trial, RCA presented the testimony of an accounting expert who was the sole witness. This memorandum embodies the court's conclusions of law, based on the stipulated facts and testimony.

At issue is the extent to which a taxpayer may properly rely on the accrual method of accounting in computing its income for tax purposes. The case involves service contracts made in 1958 and 1959 between RCA and purchasers of new television sets. Under those contracts, the purchaser generally paid RCA a lump sum at the time of purchase, and, in return, RCA agreed to service the television anytime trouble developed over a specified period of from three to twenty–four months. Prior to 1958, such contracts were offered by RCA Service Company, Inc. ("RCAS"), a wholly owned subsidiary of RCA, which was merged into RCA on December 31, 1957, and subsequently operated as a separate corporate division.

Both RCAS and RCA kept their books on an accrual basis. The amounts received from the sale of service contracts were initially divided between that portion to be treated as revenue immediately, which covered the costs of selling and processing the contract, plus a profit, and that portion to be treated as unearned revenue, which was credited to a reserve account. Each month throughout the life of the contract a portion of this reserve was credited to revenue, based on statistically derived schedules designed to take into account as revenue each month that portion of prepaid service contract receipts attributable to the services performed that month under such contracts. This scheme was intended to ensure that such receipts were treated as revenue from

Cahill Gordon & Reindel, New York City, for plaintiff; Walter C. Cliff, George Wailand, James S. Kaplan, New York City, of counsel.

John S. Martin, Jr., U. S. Atty. for the Southern District of New York, New York City, for defendant; William G. Ballaine, Asst. U. S. Atty., New York City, of counsel.

month to month only in proportion to related expenses incurred, and thus that RCA's income–the difference between its revenues and expenses–was accurately reflected in its books.

In computing its 1958 and 1959 income for tax purposes, RCA employed the same method of accounting that it used in keeping its own books. Thus, in reporting its income for those years for tax purposes, RCA only included in income those portions of the amounts received each year from the sale of service contracts that were treated as immediate revenue attributed to the administrative costs of selling the contracts, or attributed, according to RCA's calculations, to services performed during that year. The remainder of the amounts received each year from the sale of service contracts was not included in income for that year, but carried over as a reserve and included in income for subsequent years.

In auditing RCA's returns for 1958 and 1959, the Commissioner concluded that RCA's method of spreading the recognition as revenue of prepaid service contract receipts over the life of the contracts did not "clearly reflect income," as required under I.R.C. § 446(a). Invoking his authority under I.R.C. § 446(b), the Commissioner treated RCA's prepaid receipts as revenue in the year received, and recomputed RCA's taxes on that basis. RCA paid the assessments, then commenced this suit to recover them.

The mechanics of RCA's method for accruing prepaid service contract revenue are set forth fully in the stipulation of facts. Briefly stated, RCA treated all contracts of a particular length entered into during a particular month as a single category. Drawing on its past experience, RCA developed statistical estimates of the percentage of all the service calls expected to be made under contracts of a particular category that would be made during each month of those contracts' term. These estimates were aggregate figures: RCA did not purport to predict when individual televisions covered by contract within a given category would require service, but only the incidence of service calls under such contracts.

RCA continuously refined these estimates in light of its continuing experience.

These estimates of relative monthly service call volume provided the basis for RCA's monthly allocation to revenue of a portion of its receipts from the sale of contracts in each category, and ultimately for the recognition of those receipts as revenue in tax years other than that in which they were received. For instance, RCA's projections indicated that 4.33% of all service calls that would be required under all one–year service contracts entered into in September, 1959, would be made in September of that year, 9.08% in October, 7.87% in November, and 8.71% in December. The remaining service calls would all occur during the first nine months of 1960. Consequently, for tax purposes RCA treated as revenue in 1959 (in addition to the amounts treated as immediate revenue attributable to the costs of selling and processing contracts) only 29.96% of the amounts it received in September, 1959 from the sale of one year service contracts. The remainder would have been treated as revenue in 1960, had the Commissioner not intervened and insisted that RCA treat all amounts received in 1959 as revenue in 1959.

RCA contends that its accrual method of accounting did "clearly reflect income," and consequently that the Commissioner lacked authority under the Code to require RCA to adopt a different method. Alternatively, RCA argues that it is entitled to a refund of about 75% of the assessments it paid because a Revenue Procedure, Rev.Proc. 71–21, 1971–2 C.B. 549, and related Revenue Ruling, Rev.Rul. 71–299, 1971–2 C.B. 218, promulgated by the Commissioner in 1971, which permit a limited use of accounting procedures like that employed by RCA in 1958 and 1959, are retroactive in effect.

The Government responds, first, that it was within the Commissioner's discretion to find that RCA's accounting method did not "clearly reflect income," and therefore to require RCA to use a different method; second, that the Revenue Procedure and Revenue Ruling on which RCA relies do not have retroactive effect; and third, that in

any event RCA is not entitled to a refund for taxes paid in 1958 and 1959 because RCA was required to, but did not, obtain the consent of the Commissioner before employing its accrual method in computing its income for tax purposes, since RCAS had never done so. See I.R.C. § 381(c)(4).

## I.

Prior to 1916, the Revenue Acts recognized only the "cash receipts and disbursements" method of accounting. However, in the Revenue Act of 1916 Congress provided that a corporate taxpayer that kept its books on some basis other than actual receipts and disbursements could report its income on the same basis, "unless such other basis does not clearly reflect its income." Revenue Act of 1916, c. 463, § 13(d), 39 Stat. 756. The purpose of the new provision

> "was to enable taxpayers to keep their books and make their returns according to scientific accounting principles, by charging against income earned during the taxable period, the expenses incurred in and properly attributable to the process of earning income during that period."

*United States v. Anderson*, 269 U.S. 422, 440, 46 S.Ct. 131, 134, 70 L.Ed. 347 (1926). This provision of the 1916 Act is reflected today in section 446 of the Internal Revenue Code of 1954, which provides:

"(a) General Rule.–Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) Exceptions.–If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

(c) Permissible methods.–Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting–

(1) the cash receipts and disbursements method;

(2) an accrual method; . . . ."

The first and principal question to be resolved here is whether the accrual method of accounting, as implemented by RCA, "clearly reflects income" within the meaning of section 446(a).[1]

## A.

The Government relies principally on a trilogy of decisions of the United States Supreme Court: *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957), *American Auto-*

1. The role of accrual accounting in the tax context was succinctly described in *Mooney Aircraft, Inc. v. United States*, 420 F.2d 400 (5th Cir. 1969):

   " 'Income' has been defined as 'a net or resultant determined by matching revenues with related expenses.' Since the Internal Revenue Code allows the deduction of substantially all business expenses it seems reasonably clear that Congress intended to tax only net business income. This objective, however, is complicated by the fact that the tax is exacted on an annual basis whereas business transactions are often spread over two or more years. A business may receive payment for goods or services in one tax year but incur the related expenses in subsequent tax years. The result is that the expenses cannot be used to offset the receipts, and the full amount of the receipts is taxed as though it were all net 'profit.'

   The purpose of 'accrual' accounting in the taxation context is to try to alleviate this prob-

lem by matching, in the same taxable year, revenues with the expenses incurred in producing those revenues. Accurate matching of expenses against revenues in the same taxable year may occur either by 'deferring' receipts until such time as the related expenses are incurred or by 'accruing' estimated future expenses so as to offset revenue. Under the deferral concept present receipts are not recognized as 'income' until they are 'earned' by performing the related services or delivering goods. It is thus not the actual receipt but the *right* to receive which is controlling; and, from an accounting (if not from a tax) point of view, that 'right' does not arise until the money is 'earned.' A corresponding principle states that expenses are to be reported in the year the related income is 'earned' whether or not actually paid in that year."

*Id.* at 402–03 (footnotes omitted).

mobile Association v. United States, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961), and Schlude v. Commissioner, 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963). In each of these cases the Court upheld the Commissioner's determination that the accrual method of accounting used by the taxpayer did not clearly reflect income; the Government argues here that together they establish that the Commissioner may reject the use, for tax purposes, of any accounting method which defers until subsequent tax years the inclusion in gross income of payments received for services to be rendered at unspecified dates in the future.

In the first case in the trilogy, *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957) ("*Michigan*"), the automobile club provided a variety of services to its members, at their request, such as road maps and highway repairs. Membership dues were collected annually, in advance. On its books, the club recorded one–twelfth of each dues payment as revenue each month of the membership year. For tax purposes, it reported its gross income as recorded on its books. Thus, it did not include the full amount of each dues payment in its gross income for the tax year in which it was received. Instead dues payments were split, one portion included in gross income for the tax year of receipt, the remainder in gross income for the following tax year, in proportion to the number of months of the membership year which fell within each tax year. The Court, holding that this method of accounting did not clearly reflect income, expressed its rationale in a single sentence:

> "The pro rata allocation of the membership dues in monthly amounts is purely artificial and bears no relation to the services which petitioner may in fact be called upon to render for the member."

*Id.* at 189. In a footnote, the Court distinguished *Beacon Publishing Co. v. Commissioner*, 218 F.2d 697 (10th Cir. 1955), in which it was held that the Commissioner exceeded his authority in requiring the taxpayer to treat sums received for prepaid newspaper subscriptions as revenue during the year they were received, rather than over the life of the subscriptions, and *Schuessler v. Commissioner*, 230 F.2d 722 (5th Cir. 1956), in which the court rejected the Commissioner's attempt to require the taxpayer to treat as revenue during the year received that portion of receipts from the sale of gas furnaces which was properly attributable to the taxpayer's contractual obligation to turn the furnaces on and off each year for five years:

> "In *Beacon*, performance of the subscription, in most instances, was, in part, necessarily deferred until the publication dates after the tax year. In *Schuessler*, performance of the service agreement required the taxpayer to furnish services at specified times in years subsequent to the tax year. In this case, substantially all services are performed only upon a member's demand and the taxpayer's performance was not related to fixed dates after the tax year."

353 U.S. at 189 n.20, 77 S.Ct. at 712 n.20. In many respects, the parties' contrary positions here are reflected in these two quotations. RCA, relying on the statement quoted from the text of the decision, contends that the teachings of this decision and the subsequent decisions in the trilogy is simply that an accounting method that is "purely artificial" is not acceptable, but that a method which can be shown to accurately record related revenues and expenses in the proper accounting period is not. The Government, relying on the quotation from the footnote, argues that the Commissioner may reject any method for deferring recognition of receipts as revenue, no matter how accurately it matches revenues and expenses, if "the contract revenues in question are tied to future services to be performed without relation to fixed dates in the future." We conclude that RCA's position is the correct one. In our view, the subsequent decisions of the Supreme Court establish that the fact that the services paid for are not to be performed on fixed dates is not in and of itself determinative, but is significant only insofar as it throws light on the question whether the challenged accounting method is "artificial" because it

fails adequately to ensure that receipts are included in gross income in any tax year only in proportion to related expenses incurred during that year.

Two years after the Supreme Court's decision in *Michigan*, the Second Circuit, in *Bressner Radio, Inc. v. Commissioner*, 267 F.2d 520 (2d Cir. 1959), *nonacq.*, Rev.Rul. 60–85, 1960–1 C.B. 181 (1960), adopted the interpretation of *Michigan* which RCA urges here. The facts in *Bressner* were virtually identical to those of the case at hand: Like RCA, Bressner sold televisions and entered into written contracts to service them. Bressner's service contracts, unlike RCA's, covered initial installation as well as service, and were available for a twelve month term only. Bressner received between $80 and $100 for each contract, the initial cost of installation was approximately $19, and Bressner's experience showed that an average of 8 to 12 service calls would be made during the term of each contract. Accordingly, Bressner treated 25% of the contract price as revenue at time it was received, to cover the costs of installation, and "deferred the balance over the twelve month period of the contract." *Id.* at 521. The Second Circuit found that this method of accounting did clearly reflect income, that the method which the Commissioner sought to substitute for it (which is similar to the method the Commissioner employed here in recomputing RCA's income for 1958 and 1959) and grossly distorted income, and held that the Commissioner overstepped his authority in rejecting Bressner's method in favor of his own.

Distinguishing the Supreme Court's decision in *Michigan*, the Second Circuit stated:

"It is apparent from the decision of the majority that at least for purposes of the decision of the case it assumed that a realistic deferral would have been permissible, and found only that no realistic deferral was made.... The majority appears to have proceeded from an assumption that accrual accounting would be acceptable tax practice."

*Id.* at 526–27. The court found that unlike the taxpayer in *Michigan*, Bressner had proven that its deferral method was "realistic":

"There is nothing apparently artificial about the petitioner's method of deferral here. Drawing on its experience with thousands of contracts it has demonstrated that it was subjected to a reasonably uniform demand for services, so that it could and did anticipate that the expenses incident to the performance which alone would entitle it to regard the sum received as earned would be distributed across the life of the contract. It therefore deferred revenues until they were earned, and thus matched them with foreseeably related expenses, which is the essential purpose of accrual accounting."

*Id.* at 528. It is clear that if *Bressner* were the last word on the issue, RCA would prevail here. The question, however, is whether subsequent decisions of the Supreme Court have limited or overruled *Bressner*, and if so to what extent.

The second decision in the trilogy is *American Automobile Association v. United States*, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961) ("*AAA*"). There the taxpayer, also an automobile club, had accounted for membership dues using the same method as the taxpayer in *Michigan* —that is, it had recorded dues as revenue on its books ratably over the twelve month membership period, thereby including dues payments in its gross income each tax year only to the extent that that tax year coincided with the membership period. However, in *AAA* the taxpayer presented

"expert accounting testimony indicating that the system used was in accord with generally accepted accounting principles; that its proof of cost of member service was detailed; and that the correlation between that cost and the period of time over which the dues were credited as income was shown and justified by proof of experience."

*Id.* at 691, 81 S.Ct. at 1729. Relying on this testimony, the taxpayer argued that it had demonstrated that its method of deferring the recognition of revenue ratably was not "artificial."

The Court of Claims rejected this argument, and the Supreme Court, "[r]ecognizing a conflict between the decision below and that in *Bressner Radio, Inc. v. Commissioner,*" *id.* at 689, 81 S.Ct. at 1728, granted certiorari.

In affirming the Court of Claims' decision on remand, the Court relied on its earlier decision in *Michigan,* stating that its earlier holding,

"that the system of accounting was 'purely artificial[,]' was based upon the finding that 'substantially all services are performed only upon a member's demand and the taxpayer's performance was not related to fixed dates after the tax year.'"

*Id.* (quoting 353 U.S. at 189 n.20, 77 S.Ct. at 712 n.20). Responding to the taxpayer's argument that the proof at trial established that in the aggregate it provided services to its members evenly throughout the year (despite the fact that it was impossible to know beforehand when any *individual* member would seek services), and therefore that it was justified in recognizing membership dues as revenue ratably over the membership year, the Court remarked:

"[O]ther findings merely reflecting statistical computations of average monthly cost per member on a group or pool basis are without determinate significance to our decision that the federal revenue cannot, without legislative consent and over objection of the Commissioner, be made to depend upon average experience in rendering performance and turning a profit. Indeed, such tabulations themselves demonstrate the inadequacy from an income tax standpoint of the *pro rata* method of allocating each year's membership dues in equal monthly installments not in fact related to the expenses in-

curred. Not only did individually incurred expenses actually vary from month to month, but even the average expenses varied—recognition of income nonetheless remaining ratably constant."

*Id.* at 693, 81 S.Ct. at 1730.[2]

It would be less than candid to say that we do not find this passage to be cryptic. While it appears to reject out of hand the use of "statistical computations" made on a "group or pool basis" in computing income for tax purposes, it provides as a rationale for doing so only the observation that the taxpayer's pro rata deferral method did not in fact accurately match revenues and expenses. If read broadly as a blanket proscription of the use of statistical computations of average cost "on a group or pool basis," it presents a formidable hurdle to RCA's recovery in this case. We believe, however, that in view of its opacity, and in the light of subsequent decisions, the passage should be more narrowly construed. Indeed, shortly after the decision in *AAA,* the Second Circuit went out of its way to state its conclusion that the Supreme Court's decision in no way impaired the vitality of *Bressner,* a case in which deferral was allowed based on "the taxpayer's statistics show[ing] a definite monthly business experience and financial expectancy." *Automobile Club of New York,* 304 F.2d 781, 784 (2d Cir. 1962).

This brings us to the third decision of the trilogy, *Schlude v. Commissioner,* 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963). In this case, the taxpayers had prevailed in the Court of Appeals, which rendered its decision prior to the Supreme Court's decision in *AAA.* On the Commissioner's appeal to the Supreme Court, the case was remanded for further consideration in light of *AAA,* and the Court of Appeals reversed its posi-

2. The Court continued:

"Although the findings below seem to indicate that it would produce substantially the same result as that of the system employed, we consider similarly unsatisfactory, from an income tax standpoint, allocation of monthly dues to gross monthly income to the extent of *actual* service expenditures for the same month computed on a group or pool basis."

*AAA,* 367 U.S. at 693, 81 S.Ct. at 1730 (emphasis added). This sentence presaged the Court's subsequent analysis in the third case in the trilogy, *Schlude v. Commissioner,* 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963), *discussed infra.*

tion and upheld the Commissioner. The Supreme Court "brought the case back once again to consider whether the lower court misapprehended the scope of" *AAA, id.* at 130, 83 S.Ct. at 602, which may indicate that *AAA* may not cut so wide a swath as its broad language would suggest. Though the Court did affirm the Court of Appeals' determination that the accrual method employed by the taxpayers in *Schlude* did not "clearly reflect income," this does not, in view of the facts in *Schlude*, necessarily indicate that the Court endorsed a broad reading of *AAA*. To the contrary, we believe that *Schlude*, by implication, narrowed the scope of *AAA*.

The taxpayers in *Schlude*, who operated dance studios, sold contracts for specified numbers of hours of dance lessons, ranging from five to 1,200. The contracts specified the period during which the lessons had to be taken, but the actual dates of lessons were arranged from time to time as they were taken. Under the contracts, the student was obliged to pay the full contract price whether or not any or all of the lessons were actually taken. The Court summarized the taxpayers' method of accounting for the amounts received under these contracts as follows:

"When a contract was entered into, a 'deferred income' account was credited for the total contract price. At the close of each fiscal period, the student record cards were analysed and the total number of taught hours was multiplied by the designated rate per hour of each contract. The resulting sum was deducted from the deferred income account and reported as earned income on the financial statements and the income tax return. In addition, if there had been no activity in a contract for over a year, or if a course were reduced in amount, an entry would be made canceling the untaught portion of the contract, removing that amount from the deferred income account, and recognizing gain to the extent that the deferred income exceeded the balance due on the contract, *i. e.*, the amounts received in advance.... The balance of the deferred income account would be carried forward into the next fiscal year to be increased or decreased in accordance with the number of new contracts, lessons taught and cancellations recognized."

*Id.* at 131–32, 83 S.Ct. at 603. The Court held that it was proper for the Commissioner to reject this method of accounting as not clearly reflecting income, finding the question "squarely controlled" by *AAA*. The Court concluded that the system employed by the taxpayers suffered from the same vice as the systems disallowed in *Michigan* and *AAA*, "since the advance payments related to services which were to be performed only upon customers' demands without relation to fixed dates in the future." The Court's analysis, however, establishes that this fact was significant only because it ensured that the accounting method the taxpayers employed could not accurately match revenues and related expenses:

"[T]he studio sought to defer its cash receipts on the basis of contracts which did not provide for lessons on fixed dates after the taxable year, but left such dates to be arranged from time to time by the instructor and his student. Under the contracts, the student could arrange for some or all of the additional lessons or could simply allow their rights under the contracts to lapse. But even though the student did not demand the remaining lessons, the contracts permitted the studio to insist upon payment in accordance with the obligations undertaken and to retain whatever prepayments were made without restriction as to use and without obligation of refund. *At the end of each period, while the number of lessons taught had been meticulously reflected, the studio was uncertain whether none, some or all of the remaining lessons would be rendered.*"

*Id.* at 135–36, 83 S.Ct. at 605 (emphasis added). In a footnote, the Court further explained its reasoning:

"The treatment of 'gains from cancellations' underlines this aspect of the case. These gains, representing amounts paid

or promised in advance of lessons given, were recognized in those periods in which the taxpayers arbitrarily decided the contracts were to be deemed canceled. *The studio made no attempt to report estimated cancellations in the year of receipt, choosing instead to defer these gains to periods bearing no economic relationship to the income recognized."*

*Id.* at 136 n. 9, 83 S.Ct. at 605 (emphasis added). In light of these passages, it appears that what the Court found "artificial," and therefore impermissible, about the taxpayers' method of accounting for advance payments related to services to be performed "only upon customers' demand without relation to fixed dates in the future" was not that the *time* of performance was not specified, but rather that the *extent* of performance was not specified, and consequently there was no assurance that including receipts in gross income to the extent of *actual* expenses incurred each year was equivalent to including receipts in gross income in proportion to that year's share of total expenses to be incurred over the life of the contract. As the dissent in *Schlude* points out, this inadequacy could be remedied only through the use of statistical projections of anticipated expenses not unlike those employed by RCA here. And, as the dissenting opinion further indicates, the majority's reference to the use of "estimated cancellations" as the cure for the defect dispels any suggestion that the broad but cryptic language used by the Court in *AAA* was intended to bar the use of such projections, provided they are adequately supported. *See id.* at 142, 83 S.Ct. at 608 (Stewart, J., dissenting).

A similar view of the trilogy was adopted in *Mooney Aircraft, Inc. v. United States*, 420 F.2d 400 (5th Cir. 1970). There the court rejected the position which the Government takes here:

"The Government argues that *Schlude* and *AAA* require that [the cost of performing prepaid services] must arise on fixed dates. But we think that the rele-

vance of the 'fixed dates' criteria in *Schlude* and *AAA* was that since there were no fixed dates on which services had to be performed, there was no assurance that services *would be performed* after the tax year.... All that *Schlude* and *AAA* would seem to require is that the deferred income is reported as the related costs do in fact occur."

*Id.* at 407–08 (emphasis in original). Though in *Mooney* the court nonetheless concluded that the taxpayer was not entitled to defer the recognition of revenues for 15, 20, or 30 years until the related expenditure occurred, it did so only because the inordinate length of time involved completely attenuated the relationship between receipt and expenditure and lessened the probability that the expenditure would in fact be paid. *Id.* at 409–10.

Other lower court decisions are not to the contrary. In *Artnell Co. v. Commissioner*, 400 F.2d 981 (7th Cir. 1968), *Boise Cascade Corp. v. United States*, 530 F.2d 1367 (Ct. Cl.) *cert. denied*, 429 U.S. 867, 97 S.Ct. 176, 50 L.Ed.2d 147 (1976), and *Morgan Guaranty Trust Co. v. United States*, 585 F.2d 988 (Ct.Cl.1978), the courts ruled that the taxpayer was entitled to defer recognition of revenue, although in each case the services involved were to be performed on fixed dates. In *Hagen Advertising Displays, Inc. v. Commissioner*, 407 F.2d 1105 (6th Cir. 1969), the court ruled that the taxpayer was not entitled to defer the recognition of revenue, but there the taxpayer, which was paid in advance to manufacture advertising signs to be delivered in subsequent tax years, treated the advance payments as revenue *only* in the year the signs were delivered, even though it often started work on them as soon as it received an order.

■ In our view, the teachings of the trilogy can be briefly summarized as follows: *Michigan* and *AAA* establish that a taxpayer may not simply prorate recognition of receipts as revenue over the period in which the service covered by those receipts is to be rendered, because there is no

assurance that those services will be rendered ratably over that period. *Schlude*, on the other hand, establishes that a taxpayer may not, automatically each year, recognize revenue to the extent of *actual* expenses incurred that year, because there is no assurance that this amount will accurately reflect the portion of the total expenses to be incurred under the contract attributable to that year. In each of these cases the Court found the taxpayers' method of accounting for prepaid receipts "artificial" not, as the Government contends here, because those receipts related to services to be performed at unspecified times in tax years subsequent to that of their receipt, but rather, as RCA argues, because in each case the taxpayers' accounting method failed to account properly for that fact through the use of adequately supported statistical projections.

As *Schlude* makes clear, the use of such projections is essential to any system of accounting on an accrual basis for prepaid revenues covering services to be performed at unspecified times. The Government argues, however, that such projections may not be used in computing income for tax purposes. It relies heavily on the suggestion in *AAA* that "the federal revenue cannot, without legislative consent and over objection of the Commissioner, be made to depend upon average experience in rendering performance and turning a profit," 367 U.S. at 693, 81 S.Ct. at 1730, and seeks to bolster this suggestion by reference to the following passage from the Supreme Court's recent decision in *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 543, 99 S.Ct. 773, 786, 58 L.Ed.2d 785 (1979):

"The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested; the major responsibility of the accountant is to protect these parties from being misled. The primary goal of the income tax system, in contrast, is the equitable collection of revenue; the major responsibility

of the Internal Revenue Service is to protect the public fisc....

This difference in objectives is mirrored in numerous differences of treatment.... Financial accounting, in short, is hospitable to estimates, probabilities, and reasonable certainties; the tax law, with its mandate to preserve the revenue, can give no quarter to uncertainty."

*Id.* at 542–43, 99 S.Ct. at 786–87.

■ We find the Government's position unpersuasive. As indicated above, the language the Court used in *AAA* is far from clear, and must be read in light of the Court's subsequent statements in *Schlude*. And while it is true that in *Thor* the Court indicated that the Commissioner, because of his duty to protect the public fisc, must give less quarter to "estimates, probabilities, and reasonable certainties" then a financial accountant may or ought to, the thrust of *Thor* is that a taxpayer's method of accounting must be justified by hard evidence, *including statistical evidence, see id.* at 527, 99 S.Ct. at 778 (criticizing the taxpayer for failing to present "statistical evidence justifying its system for writing down inventory), rather than assumptions based on "general business experience," or "well–educated guesses." In our view, a taxpayer is entitled to rely on reliable statistical projections of anticipated expenses in determining the extent to which prepaid amounts should be included in gross income in tax years other than that of their receipt, in accordance with the principles of accrual accounting.

■ Accordingly, we conclude that the Commissioner is not authorized to reject a deferral method of accounting *simply* because the deferred revenues relate to services to be performed at unspecified times in tax years subsequent to that of receipt. Through the use of statistical projections, a taxpayer using a deferral method may achieve a reasonably precise matching of revenues and expenses despite the fact that the actual time services will have to be

performed is not known, thereby computing income "according to scientific accounting principles, by charging against income earned during the taxable period, the expenses incurred in and properly attributable to the process of earning income during that period." *United States v. Anderson, supra,* 269 U.S. at 440, 46 S.Ct. at 134. RCA contends that the method of accounting it used in 1958 and 1959, which was based, unlike those employed by the taxpayers in *Michigan, AAA,* and *Schlude,* on hard statistical data rather than informed hunches, did just that. Assuming that RCA's statistical projections were reliable and properly used, we believe the Commissioner could not require RCA to use a different method of accounting simply because RCA could not know, in advance, when it would be required to provide service under *individual* service contracts.

### B.

The Government, however, argues more broadly, in the alternative, that the Commissioner may reject any method of accounting that defers the inclusion of payments *for future services until later tax* years, unless that method is expressly authorized by statute. The short answer to this argument is that the accrual method of accounting *is* expressly authorized by statute. The longer answer is that the authorities on which the Government relies do not establish that the Commissioner enjoys the unbridled discretion that the Government's argument would vest in him; the ultimate question remains whether a taxpayer's method of accounting "clearly reflects income."

The premise for the Government's argument on this point is Congress' introduction and subsequent repeal of sections 452 and 462 of the Internal Revenue Code of 1954. Ch. 736, §§ 452, 462, 68A Stat. 3, *repealed,* ch. 143, § 1, 69 Stat. 134 (1955). Section 452, a part of the 1954 Code as originally enacted, authorized deferral practices such as that employed by RCA in preparing its returns for 1958 and 1959. Section 462 authorized similar accrual practices. Both provisions were retroactively repealed one year after the Code was enacted "upon [the] insistence by the Treasury that the proposed endorsement of such tax accounting would have a disastrous impact on the Government's revenue." *AAA, supra,* 367 U.S. at 695, 81 S.Ct. at 1731.

In *AAA,* the Court observed:

"It appears that in this action Congress first overruled the long administrative practice of the Commissioner and holdings of the courts in disallowing such deferral of income for tax purposes and then within a year reversed its own action. This repeal, we believe, confirms our view that the method used by the Association could be rejected by the Commissioner. While the claim is made that Congress did not 'intend to disturb prior law as it affected permissible accrual accounting provisions for tax purposes,' H.R.Rep. No. 293, 84th Cong. 1st Sess. 4–5, the cold fact is that it repealed the only law incontestably permitting the practice upon which the Association depends."

*Id.* at 695, 81 S.Ct. at 1731. In *Schlude* the Court again adverted to Congress' action, noting that in *AAA* the legislature's repeal of

" 'the only law incontestably permitting the practice upon which [the taxpayer] depends,' was regarded as reinstating long–standing administrative and lower court rulings that accounting systems deferring prepaid income could be rejected by the Commissioner."

372 U.S. at 134, 83 S.Ct. at 604. The Government's argument is that the Court's reading of this legislative history demonstrates the Commissioner's authority to reject any method of accounting that does not treat payments received for future services as gross income in the year of receipt.

■ Although one court may have adopted the position that the government urges

here, *see Hagen Advertising Displays, Inc. v. Commissioner*, 407 F.2d 1105 (6th Cir. 1969), others have clearly rejected it, *e. g. Boise Cascade Corp. v. United States*, 530 F.2d 1367 (Ct.Cl.), *cert. denied*, 429 U.S. 867, 97 S.Ct. 176, 50 L.Ed.2d 147 (1976); *Mooney Aircraft, Inc. v. United States*, 420 F.2d 400 (5th Cir. 1970); *Artnell Co. v. Commissioner*, 400 F.2d 981 (7th Cir. 1968). We find particularly persuasive the Fifth Circuit's commentary in *Mooney*:

> "This alternative ground, based on legislative intent, would seem to dispose of the entire question: *all* deferrals and accruals are bad unless specifically authorized by Congress. But the Court was careful to discuss the legislative history as dictum and restricted its holding to a finding that the Commissioner did not abuse his discretion in rejecting the AAA's accounting system. It specifically refrained from overruling *Beacon* and *Schuessler*, distinguishing them on the ground that future performance was certain. It seems, then, that the Court is for the present taking a middle ground pending Congressional reform and clarification in this extremely confused area of the law: While the repeal of §§ 452 and 462 does not absolutely preclude deferrals and accruals, it indicates that the Commissioner should have very broad discretion to disallow such accounting techniques when there is any reasonable basis for his action."

420 F.2d at 408–09 (footnotes and citation omitted). We agree with this analysis. As the Seventh Circuit stated in *Artnell, supra*, 400 F.2d at 985:

> "[T]here must be situations where the deferral technique will so clearly reflect income that the Court will find an abuse of discretion if the Commissioner rejects it."

*See Thor Power Tool Co. v. Commissioner, supra*, 439 U.S. at 533, 99 S.Ct. at 781. The proper test, under the statute, remains whether the accounting method in question "clearly reflects income"–that is, in our view, whether it ensures, with reasonable precision, that deferred revenues are included in gross income in tax years subsequent to that in which they are received only in proportion to the related services performed, and expenses incurred, during those tax years.

### C.

Because we conclude that as a matter of law RCA was entitled to use a deferral method of accounting based on reliable statistical projections in computing its income for tax purposes, so long as that method did "clearly reflect income," and because we conclude, *infra*, that RCA has adequately demonstrated that the method it used in 1958 and 1959 matched revenues and related expenses with such precision that it was beyond the Commissioner's discretion to conclude that that method did not "clearly reflect income," we need not address RCA's alternative argument that it is entitled to a refund because Revenue Procedure 71–21 and Revenue Ruling 71–299 apply retroactively.

These administrative directives reflect the Commissioner's 1971 decision

> "to allow accrual method taxpayers in certain specified and limited circumstances to defer the inclusion in gross income for Federal income tax purposes of payments received (or amounts due and payable) in one taxable year for services to be performed by the end of the next succeeding taxable year."

Rev.Proc. 71–21, § 1, 1971–2 C.B. 549 (1971). Under Revenue Procedure 71–21, a taxpayer who receives advance payment pursuant to an agreement that requires the taxpayer to perform contingent services no later than the end of the tax year following the tax year in which payment is received may defer inclusion of part of the payment in gross income

> (a) on a statistical basis if adequate data are available to the taxpayer; (b) on a straight–line ratable basis over the time period of the agreement if it is not unrea-

sonable to anticipate at the end of the taxable year of receipt that a substantially ratable portion of the services will be performed in the next succeeding taxable year; or (c) by the use of any other basis that in the opinion of the Commissioner, results in a clear reflection of income. *Id.* § 3.06. In Revenue Ruling 71–299, 1971–2 C.B. 218 (1971), the Commissioner modified his earlier nonacquiescence in the Second Circuit's decision in *Bressner,* Rev. Rul. 60–85, 1960–1 C.B. 181 (1960), "to the extent inconsistent with Section 3 of Revenue Procedure 71–21."

Although we need not decide whether RCA is entitled to relief under these provisions, it is worth noting that the Government's staunch opposition to RCA's accounting method is undercut at least to some extent by the Commissioner's determination that statistical deferral methods have a place in tax accounting, and will be accepted by the Internal Revenue Service at least in some circumstances, as a proper

basis for the computation of income for tax purposes.

## II.

The next question is whether RCA's method of accounting for prepaid service contract revenues, as actually applied in 1958 and 1959, achieved its objective of matching revenues and related expenses with precision. We find that it did.

The most telling piece of evidence on this point, as indicated in Exhibit Q to the Stipulation of Facts, which is reproduced below, is the very high correlation between RCA's monthly net sales from its service business, which consisted principally of service contract revenues included in monthly income on the basis of RCA's statistical projections, and the related direct expenses RCA *actually* incurred during each month of 1958 and 1959. This alone indicates that RCA's accounting method predicted the flux of RCA's service business quite accurately.[3]

---

**3.** Exhibit Q [on the following pages] represents graphically the data set forth in ¶ 39 of the Stipulation of Facts.

EXHIBIT Q
STIPULATION OF FACTS
69 Civ. 2633 (MEL)

1958

NET SALES ───────

(000,000)

DIRECT EXPENSE ─ ─ ─ ─

(000,000)

NET SALES ─────

(000,000)

1959

DIRECT EXPENSE ─ ─ ─

(000,000)

In addition, Charles Gillette, a partner in the accounting firm of Arthur Young & Co. and chair of its Policy Statements Committee, testified that in his opinion the stipulated facts show that RCA's system achieved "a very high degree of precision,"[4] and at trial the Government stipulated that "it does accomplish its objective, which is to match all revenues for demand and contract to all expenses for demand and contract services."[5] Nonetheless, the Government contends that RCA has not carried its burden of proving that its system is adequate for tax purposes.

The Government's limited "concession" that RCA's accounting method does "match all revenues for demand and contract to all expenses for demand and contract services" is representative of one class of objections it makes to RCA's use of that method in computing its taxes. Briefly stated, the Government takes the position that to prevail RCA must prove not only that its accounting system *as a whole* works with precision, but also that each component of the system does so. Thus, the Government argues that the statistical projections RCA used in determining what portion of service contract receipts should be included in gross revenue each month were not adequate for that purpose for a number of reasons—because in some cases the projections were based on data reflecting service calls performed on demand as well as service calls performed pursuant to service contracts; because their statistical sophistication varied widely; because they protected service call volume rather than dollar expenses; and because they were not broken down to take account of various options available to the purchasers of RCA's service contracts. These objections are material only if the Government is correct that RCA must prove something more than that its accounting method, as a whole, matched revenues and expenses well. We do not believe the Government is correct: the projections were only intended to, and, in our view of the law, need only, operate in the aggregate. If the evidence shows that the whole package of RCA's projections, as applied in 1958 and 1959, achieved a reasonably precise allocation of revenues to the accounting periods in which related expenses were incurred, it is not significant that some of the projections used were "less scientifically, less precisely determined" than others.[6] Moreover, imprecisions in RCA's *monthly* projections would not necessarily be significant here, since for tax purposes what is controlling is not whether the projections properly matched revenues and expenses from month to month, but whether they did so from year to year.

The Government also asserts that RCA has not proven that the data it used in formulating its statistical projections were accurate. But RCA's after–the–fact demonstration that its projections were valid predictors of its expenses creates a strong presumption that the underlying data was accurate, and the Government has not overcome the presumption. The Government contends only that RCA has failed in its proof—it has not suggested that RCA's data gathering procedures, record keeping, or statistical method were defective in any way, and while it would be remarkable if a project of this scope were completely free from error, the Government has not indicated why any errors that may have cropped up would be material here. Moreover, some weight must be given to RCA's interest in compiling accurate information, since that information was used to aid management in scheduling and budgeting for monthly labor and materials requirements, as well as in the preparation of RCA's accounts and tax returns. In the circumstances, we do not believe it necessary that RCA, to establish the reliability of its projections, trace the pedigree of its figures to their source–the reports of thousands of daily service calls.

■ We find that RCA has carried its burden of proving that in practice its

4. Trial Transcript at 53.

5. *Id.* at 91.

6. *See id.* at 69–70.

accounting theory operated with reasonable precision, and accordingly, we conclude that the Commissioner abused his discretion under section 446 of the Code in requiring RCA to use a different method in computing its taxes.

## III.

The deferral method that RCA used in accounting for prepaid service contract revenues for both book and tax purposes was the method that RCAS used, prior to its merger into RCA on December 31, 1957, in keeping its books. It was not, however, the method RCAS used in preparing its tax returns: for tax purposes, RCAS included all amounts received each year from the sale of service contracts in its gross income for that year. The Government argues that even if the method of accounting employed by RCA in 1958 and 1959 did clearly reflect income, RCA's use of that method constituted a change of accounting method which required the Commissioner's consent, and that RCA's failure to obtain that consent bars any refund now.

The merger of RCAS into RCA was a transaction covered by section 381 of the 1954 Code, which deals with the acquisition of the assets of one corporation by another. Section 381(c)(4) provides:

"Method of Accounting—The acquiring corporation shall use the method of accounting used by the distributor or transferor corporation on the date of distribution or transfer unless different methods were used by several distributor or transferor corporations or by a distributor or transferor corporation and the acquiring corporation. If different methods were used, the acquiring corporation shall use the method or combination of

methods of computing taxable income adopted pursuant to regulations prescribed by the Secretary."

No regulations under section 381(c)(4) were promulgated until August 5, 1964, ten years after the statute was enacted, and six years after the merger was completed. As a consequence, the regulations contain "Special Rules" for acquisitions, such as that involved here, that occurred before the regulations came into being. Treas.Reg. § 1.381(c)(4)–1(e) (1964). The Government's position, apparently,[7] is that RCA may not rely on the Special Rules here because it has not proven that at the time of the merger it used a different method of accounting than RCAS, and therefore has not shown that it was entitled under section 381(c)(4) to use any method of tax accounting other than that previously used by RCAS.

This position is untenable. On their face, the Special Rules relating to acquisitions occurring prior to August 5, 1964 apply to all such acquisitions, without regard to whether the corporations involved used the same or different methods of accounting at the time of the acquisition. And although this may not conform strictly to the language of section 381(c)(4), it is the only plausible reading of the Special Rules, since prior to the issuance of the regulations on that date there was no way to know definitely under what circumstances the Commissioner would consider the accounting methods of an acquiring and acquired corporation the same or different within the meaning of the statute, and thus no way to know whether the acquiring corporation was required to use the method of accounting previously used by the acquired corporation, or some other method prescribed in as yet non–existent regulations.[8] In our view,

---

7. The parties' briefs, which were filed simultaneously, suggest that neither party fully understood the other's position on the issue discussed in this section of the opinion. Consequently, their respective legal contentions were never fully crystallized.

8. The dilemma faced by RCA at the time of its merger with RCAS is illustrative. The stipulation indicates that prior to the merger, RCA used a deferral method of accounting for sales

of coupon books that entitled the purchaser to discounts on future purchases of record albums similar to that which it later employed in accounting for service contract revenues. Although the Government asserts that this evidence is insufficient to establish that at the time of the merger RCA and RCAS used different methods of accounting, it certainly suggests that they treated similar types of receipts differently, and thus that section 381(c)(4) would require RCA, following the merger, to account

whether RCA and RCAS used the same or different methods of accounting at the time of their merger is immaterial here; the sole question is whether, under the Special Rules, RCA's decision in 1958 to adopt a method of accounting for prepaid service contract revenues different from that previously employed by RCAS contravened section 381(c)(4) of the Code.

The Government does not dispute that if the Special Rules apply here, RCA's decision is proof against any challenge based on section 381(c)(4). The Special Rules provide that if an acquisition occurred during a tax year of the acquiring corporation for which the statute of limitations has run,

> then this section does not authorize the Commissioner or the acquiring corporation to change any method or methods of accounting in any taxable year of the acquiring corporation. . . .

*Id.* § 1.381(c)(4)–1(e)(1). Here the acquisition was completed on December 31, 1957, the last day of a tax year for which the statute of limitations has run, and under

this section of the Special Rules RCA's method of accounting cannot be changed.[9]

■ Nothing in the Code or regulations suggests that the refund RCA seeks must be disallowed because RCA did not obtain the consent of the Commissioner before adopting its accrual method of accounting, and we conclude that RCA is not barred from recovery here simply because it adopted a different method of accounting from that used by RCAS prior to their merger.

\* \* \* \* \* \*

In sum, we conclude that RCA's method of accounting, in theory and in practice, clearly reflected its income for 1958 and 1959, and consequently that the Commissioner abused his discretion under section 446 of the Code in requiring RCA to adopt another method of computing its income for tax purposes. Further, under the applicable regulations, RCA was entitled to employ the accounting method it did employ even though RCAS had not previously used that method for tax purposes.

RCA is entitled to refund of the difference between the taxes it actually paid and

---

for service contract revenues "pursuant to regulations prescribed by the Secretary," even though no such regulations existed until 1964. In the existing regulatory vacuum, RCA and other taxpayers facing the same dilemma were left to their own devices. The Special Rules embodied in the regulations when they were finally issued ensure that such taxpayers are not penalized for the accounting decisions they made under such circumstances.

9. Even if the merger of RCA and RCAS had occurred during a year for which the statute of limitations had not run, the result would have been the same. The Special Rules provide that if the acquisition occurred during a tax year of the acquiring corporation for which the statute of limitations has not run, and the taxpayer has, for that tax year, (a) adopted or continued a method of accounting consistent with the rules of this section, (b) been granted permission by the Commissioner in accordance with paragraph (e) of § 1.446–1 to use a method or combination of methods of accounting, or (c) adopted a method of accounting that under other sections of the Internal Revenue Code, or regulations thereunder, may be adopted without the consent of the Commissioner, then the method or methods of accounting adopted or continued in the manner described in (a), (b), and (c) shall not be changed, by reason of the rules contained in

this section, by the Commissioner or the acquiring corporation for any taxable year ending after the date of distribution or transfer. . . . *Id.* 1.381(c)(4)–1(e)(2)(i). If the acquisition occurred during a tax year of the acquiring corporation for which the statute has not run and the taxpayer has, for that tax year, adopted or continued a method or methods of accounting other than in the manner described in (a), (b), and (c) of subdivision (i) of this subparagraph, then the acquiring corporation may--

(a) Continue to use the method or methods of accounting so adopted or continued if such method or methods clearly reflect income and if proper adjustments were made to reflect the adoption of such method of methods, or

(b) Adopt the method or methods of accounting prescribed by this section. . . . *Id.* § 1.381(c)(4)–1(e)(2)(ii). Under these provisions RCA would have been entitled to adopt its method of accounting, since we have found that it does clearly reflect income, either under section 1.381(c)(4)–1(e)(2)(i)(c) of the regulations (if, as RCA argues, section 446 of the Code authorized it to use an accrual method that clearly reflects income without obtaining the Commissioner's consent), or otherwise under section 1.381(c)(4)–1(e)(2)(ii)(a) of the regulations.

the taxes it would have paid under its method of accounting, as well as any deficiency interest paid, plus interest.

*Submit judgment on notice.*